June 23, 2017

**Supreme Court**

No. 2015-271-Appeal.
No. 2015-291-Appeal.
(KB 08-1073)

Charles E. Fogarty      :

v.      :

Ralph Palumbo et al.      :

No. 2015-273-Appeal.
No. 2015-292-Appeal.
(KB 08-1087)

James Ottenbacher      :

v.      :

Ralph Palumbo et al.      :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2015-271-Appeal.
No. 2015-291-Appeal.
(KB 08-1073)

Charles E. Fogarty : 

v. : 

Ralph Palumbo et al. : 

James Ottenbacher : 

v. : 

Ralph Palumbo et al. : 

Present: Suttell, C.J., Goldberg, and Flaherty, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The matter before us arises from the August 15, 2005, sale of an approximately 360-acre tract of undeveloped land located on Dye Hill Road in Hopkinton (the property). The plaintiffs, Charles E. Fogarty and James Ottenbacher, averred that the sale of the property to an entity of which the defendants, Ralph Palumbo and Jonathan Savage, were principals, without the plaintiffs' consent, was fraudulent; they each consequently filed an eight-count complaint in Superior Court. The plaintiffs also named Pilgrim Title Insurance Company (Pilgrim), which was the title insurance and escrow agent in connection with the sale of the property, as a defendant in this case. Following discovery, all three named defendants, Palumbo, Savage, and Pilgrim (jointly, the defendants), filed motions for summary

judgment, all of which were granted by a justice of the Superior Court. For the reasons stated herein, we affirm the judgment of the Superior Court in part and we vacate the judgment in part.

## I

## Facts[1]

The property was originally purchased by Fogarty in the 1970s. In 1994, Fogarty formed a corporation known as Stone Ridge, Inc. (Stone Ridge), with three other shareholders: Grant Schmidt, M.D.; William McComb; and co-plaintiff, Ottenbacher; each shareholder owning 25 percent of the corporation. At or about the time Stone Ridge was formed, Fogarty transferred ownership of the property to Stone Ridge. At all times pertinent to this case, the sole asset of Stone Ridge was the property and the shareholders' objective was to develop it.[2] In or about 2003, Brushy Brook Development, LLC (Brushy Brook), was created as a holding company for Stone Ridge. Title to the property was transferred from Stone Ridge to Brushy Brook[3] and Schmidt became the managing partner for Brushy Brook. After disagreement arose among the partners of Stone Ridge concerning the development plans for the property, in late 2004 and early 2005, Brushy Brook sought to sell the property either to a separate buyer or to one or more of its shareholders. As of November 2004, Ottenbacher became the president of Stone Ridge.

Ottenbacher claimed that he secured Palumbo, a certified public accountant, and Savage, a corporate attorney, to assist him in either purchasing the property, or securing another buyer.

---

[1] Our summary of the facts in this case is drawn from the complaints and from the evidence produced during discovery. We note that the first of seven Superior Court files is missing and is not part of the record on appeal. Nevertheless, we are satisfied that enough is before us to properly consider the issues raised.

[2] The project to develop the property consisted of building sixty-six single-family homes, sixty-eight townhouses, and an eighteen-hole golf course.

[3] The title transfer of the property to Brushy Brook caused Fogarty to file suit against the three other shareholders. According to Fogarty, Schmidt violated Stone Ridge's bylaws by transferring the property without the needed 100 percent of the shareholders' vote. Ultimately, a consent order was filed and the case was dismissed.

Palumbo and Savage "produced * * * a buy-out plan" whereby Ottenbacher and Fogarty, through financing, would buy out Schmidt and McComb. A buyout agreement was drafted by Adam Clavell, an associate at Savage's law firm at that time, at the direction of Savage. At deposition, Fogarty stated that he met with Ottenbacher, Palumbo, and Savage and discussed receivership as an option, but that they ultimately did not want to go that route. Fogarty testified that, at this time, Savage "was [their] attorney," and "was doing all of the paperwork," but that he had not signed a retainer agreement with, or ever paid, Savage or Savage's law firm. Fogarty averred that it was his understanding that "from November 17, [2004,] to probably towards the end of December" he was represented by Savage.[4] He further indicated that "Palumbo was supposed to then be [their] accountant for the new project."

Palumbo and Savage were the principals of an entity named Boulder Brook Development, LLC (Boulder Brook), and plaintiffs claim this was unknown to them. On April 6, 2005, the four shareholders of Stone Ridge (plaintiffs, Schmidt, and McComb) executed an Asset Purchase Agreement (APA) for the sale of the property to Boulder Brook. By the terms of the APA, a closing date was set for thirty days thereafter. The APA closing date lapsed prior to a closing occurring.[5]

Sometime in July 2005, Ottenbacher made an offer to Brushy Brook to purchase the property with a partner, Steven Kaufman.[6] According to Ottenbacher, Schmidt and McComb agreed on the sale of the property and a closing was set for August 15, 2005, with Attorney Mark

---

[4] Fogarty also maintained that in April 2005 Savage represented both himself and Ottenbacher.
[5] Emails exchanged between the parties evidence that Boulder Brook was seemingly seeking to do its due diligence in order to close on the property.
[6] Steven Kaufman is not a party to this litigation.

Spangler engaged as the closing agent.[7] In anticipation of the closing, $3,654,367.38 was transferred into Spangler's clients' trust account. On August 16, 2005, Spangler traveled to the Hopkinton Town Hall to review the Hopkinton Land Evidence Records and discovered a deed signed by Schmidt dated August 15, 2005, transferring the property to Boulder Brook (herein, the sale to Boulder Brook). As noted, Pilgrim was the title insurance agent and escrow agent in connection with the sale to Boulder Brook. According to plaintiffs, the deed was executed without their knowledge and, because the terms of the APA had since expired without a closing, their approval was required to convey the property.[8]

## II

### Travel

Approximately three years later, on August 14 and 18, 2008, Fogarty and Ottenbacher, respectively, filed two pro se complaints against Palumbo. Thereafter, in 2010, both of their

---

[7] Palumbo and Savage maintain that the proposal was rejected. In an August 1, 2005 email sent from Gerald Vande Werken, Brushy Brook's attorney, in response to two offers from Ottenbacher (one of $5 million and one of $3.6 million in cash according to the email),Vande Werken acknowledged that Boulder Brook was in default of the APA but that he had just recently learned that Boulder Brook had an entity to finance the transaction, Realty Financial Partners (RFP), and that "[a]ssuming for the moment that Savage and RFP * * * close[d] under the terms that they had previously agreed to in [the APA], their offer [was] potentially worth $500,000 more than [Ottenbacher's] offer of $5M, assuming that both parties ([Ottenbacher group] and Savage's) [were] equally capable of bringing this project to a successful conclusion." After Vande Werken articulated his doubts about whether Ottenbacher could complete a project of this magnitude, and communicated that he could not react to Ottenbacher's offer of a $3.6 million all-cash offer because he "was not certain of the details or what that proposal mean[t] to all 4 of the Stone Ridge shareholders," Vande Werken concluded that he "would recommend to [Schmidt] that [Schmidt] pursue a closing with * * * Savage and RFP ASAP" as his "gut [told him] that they [were] the ones most likely to perform the complete project."

[8] On that same day, plaintiffs filed an involuntary petition against Brushy Brook in the United States Bankruptcy Court for the Judicial District of Rhode Island (Case No. 1:05-bk-13009). Attorney Charles Pisaturo was appointed as a Chapter 7 Bankruptcy Trustee. On or about June 20, 2006, Pisaturo petitioned Stone Ridge, Brushy Brook's sole shareholder, into Bankruptcy and was also appointed the Chapter 7 Bankruptcy Trustee. After investigating the entities and the sale to Boulder Brook, Pisaturo filed suit against Schmidt and Vande Werken claiming breach of fiduciary duties. This case settled and no other claims were made.

- 4 -

complaints were amended to include Savage and Pilgrim as defendants, they obtained legal representation, and their matters were consolidated. Fogarty's second-amended complaint filed in March 2010 and Ottenbacher's first-amended complaint filed in April 2010 are nearly identical and allege, against both Palumbo and Savage, negligence (counts 1 and 2[9]), breach of contract (counts 3), tortious interference with a contractual relationship (counts 4), interference with a prospective contractual relationship (counts 5), fraud (counts 6), and civil conspiracy (counts 8). The plaintiffs also each raise one negligence count against Pilgrim (counts 7).

Discovery ensued for approximately five years. In addition to the production of documents and interrogatories exchanged between the parties, Fogarty, Ottenbacher, Schmidt, McComb, Palumbo, Clavell, Spangler, Gerald Vande Werken, who was Brushy Brook's attorney, and James A. Houle, who was retained to appraise the property, were all deposed. Certain depositions and documents produced during discovery will be discussed in further detail as they become pertinent to this Court's analysis.

On March 6, 2014, Pilgrim filed a motion for summary judgment on the negligence counts against it, to which plaintiffs objected. A hearing was held on April 7, 2014, and, on June 9, 2014, the hearing justice issued a written decision granting Pilgrim's motion. The hearing justice reasoned that there was "no genuine issue of material fact that" any "potential liability" on Pilgrim's part "was discoverable as of August 16, 2005." Unable to satisfy the requirements of the discovery-rule exception to the three-year statute of limitations set forth in G.L. 1956 § 9-1-14.3[10] for legal malpractice claims, plaintiffs' 2010 claims against Pilgrim were deemed

---

[9] Counts 2 were dismissed pursuant to an April 27, 2011 stipulation of the parties.
[10] General Laws 1956 § 9-1-14.3 provides, in relevant part, that "an action for legal malpractice shall be commenced within three (3) years of the occurrence of the incident which gave rise to the action."

untimely. Final judgment entered on August 12, 2014, and, on August 22, 2014, plaintiffs filed a notice of appeal.

As the appellate process proceeded on Pilgrim's summary disposition, defendants Palumbo and Savage filed a total of four motions for summary judgment; two of which were joint motions and two of which were Savage's individual filings.[11] A hearing was held on all four motions on November 10, 2014. In a written decision filed on December 1, 2014, the hearing justice granted all four motions for summary judgment. On April 17, 2015, the Superior Court granted final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure and plaintiffs filed a timely notice of appeal.[12]

### III

### Standard of Review

"This Court will review the grant of a motion for summary judgment de novo, employing the same standards and rules used by the hearing justice." Newstone Development, LLC v. East Pacific, LLC, 140 A.3d 100, 103 (R.I. 2016) (quoting Daniels v. Fluette, 64 A.3d 302, 304 (R.I. 2013)). "We will affirm a [trial] court's decision only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material

---

[11] Palumbo and Savage moved for summary judgment on all counts against them on the basis that plaintiffs had "failed to demonstrate any form of damages resulting from the alleged actions [of] * * * [d]efendant[s]," with a reasonable degree of certainty and, accordingly, had failed to "establish a prima facie case for any cause of action." In a separate motion, they moved for summary judgment as to counts 4, on the grounds that no contract existed between Brushy Brook and plaintiffs, a legal prerequisite and factual element to their claims of tortious interference with a contractual relationship, and on counts 5 on the basis that no business relationship or expectancy existed between Brushy Brook and plaintiffs since Brushy Brook had duly rejected plaintiffs' offer to purchase. Savage individually moved for summary judgment on counts 3, 6, and 8 of the complaints on the basis that "there [was] no evidence whatsoever that an attorney-client relationship ever existed between Savage and * * * [p]laintiffs" and, in a separate motion, on the basis that plaintiffs filed their complaints outside of the applicable statute of limitations.

[12] On March 23, 2015, Palumbo and Savage filed a motion for sanctions pursuant to Rule 11 of the Superior Court Rules of Civil Procedure. The defendants' motion was denied; this denial was not appealed and is not before this Court.

fact exists and that the moving party is entitled to judgment as a matter of law." Id. (quoting Daniels, 64 A.3d at 304). "Furthermore, 'the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions.'" Id. (quoting Daniels, 64 A.3d at 304).

"[S]ummary judgment should enter against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *." Newstone Development, LLC, 140 A.3d at 103 (quoting Lavoie v. North East Knitting, Inc., 918 A.2d 225, 228 (R.I. 2007)). "Furthermore, this Court can affirm the Superior Court's judgment on grounds other than those relied upon by the trial justice." Berman v. Sitrin, 991 A.2d 1038, 1043 (R.I. 2010).

# IV

# Analysis

# A

# Defendant Pilgrim Title Insurance Company

# 1. Negligence (Counts 7)

The plaintiffs' claims against Pilgrim are negligence-based legal malpractice claims; they allege that Pilgrim "owed a duty to all those with a legal interest in the property, to perform professional services in a competent manner and in conformance with standards applicable to closing agents." According to plaintiffs, Pilgrim breached that duty and such breach caused them to suffer damages.

On August 16, 2005, Spangler went to the Hopkinton Town Hall after being informed by plaintiffs that "something had happened" regarding the property. Upon inspecting the recordings, Spangler located the warranty deed transferring the property to Boulder Brook.

Although he could not recall the specifics, Spangler testified at deposition that "there may have been municipal lien certificates[.]" The first nine pages of the pertinent recordings located at the Hopkinton Town Hall were municipal lien certificates, each of which contained the following text on the bottom of the page: "Certificate requested by Pilgrim Title Ins. Co., 50 Park Row West, S 102, Providence, RI 02903." During discovery, plaintiffs learned for the first time that counsel for Pilgrim had requested unanimous consent of the shareholders authorizing the transaction and had been informed that it appeared that there would not be unanimity, but that he nevertheless "continued forward with the closing." A document signed by Schmidt authorizing the sale to Boulder Brook entitled "Minutes of Actions Taken in Writing and Without A Meeting by the Manager of Brushy Brook Development, LLC" was provided to Pilgrim. This document referenced an operative Asset Purchase Agreement; however, such agreement was never produced.

"General Laws 1956 § 9-1-14.3 sets forth a three-year statute of limitations for legal malpractice claims." Behroozi v. Kirshenbaum, 128 A.3d 869, 872 (R.I. 2016). Section 9-1-14.3 provides, in relevant part, that:

> "Notwithstanding the provisions of §§ 9-1-13 and 9-1-14, an action for legal malpractice shall be commenced within three (3) years of the occurrence of the incident which gave rise to the action; provided, however, that:
> "* * *
> "(2) In respect to those injuries due to acts of legal malpractice which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of legal malpractice should, in the exercise of reasonable diligence, have been discovered."

Because it is undisputed that the closing—the incident giving rise to this claim—occurred in August 2005, and that plaintiffs amended their complaints to include Pilgrim as a

defendant in March 2010, the determination of whether plaintiffs' claims against Pilgrim should be time-barred rests on the applicability of the discovery-rule exception, as set forth in § 9-1-14.3(2), to the facts in this case.

The discovery-rule exception, codified in § 9-1-14.3(2), "serves 'to protect individuals suffering from latent or undiscoverable injuries who then seek legal redress after the statute of limitations has expired for a particular claim.'" Behroozi, 128 A.3d at 873 (quoting Sharkey v. Prescott, 19 A.3d 62, 66 (R.I. 2011)). "The standard applied to this exception is objective: [I]t 'requires only that the plaintiff be aware of facts that would place a reasonable person on notice that a potential claim exists.'" Id. (quoting Sharkey, 19 A.3d at 66). "The discovery rule does not require perfect crystallization of the nature and extent of the injury suffered or a clear-cut anchoring to the allegedly negligent conduct of a defendant." Bustamante v. Oshiro, 64 A.3d 1200, 1207 (R.I. 2013). Rather, a legal-malpractice plaintiff is afforded three years to commence suit from "the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9-1-14.3(2).

> "The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiffs, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured. If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused her injuries as of some date before the plaintiff alleged that she made this discovery, then the earlier date will be used to start the running of the limitations period." Mills v. Toselli, 819 A.2d 202, 205 (R.I. 2003) (quoting Martin v. Howard, 784 A.2d 291, 300 (R.I. 2001)).

On appeal, plaintiffs argue that summary judgment as to Pilgrim should be vacated because there remain genuine issues of material fact regarding whether plaintiffs could have reasonably discovered Pilgrim's negligent conduct giving rise to their injury. The plaintiffs

- 9 -

maintain that the hearing justice "considered disputed facts in a light most favorable to Pilgrim." According to plaintiffs, it was not until they received closing documents in response to an October 2009 subpoena that they learned "the acts and omissions with Pilgrim which [gave] rise to this litigation," e.g., that Pilgrim "continued forward with the closing" despite being informed that there may not be unanimous consent of the shareholders. The plaintiffs further highlight that Spangler testified that he did not recall seeing the municipal lien certificates depicting the name of Pilgrim, and that, in any event, "Municipal Lien Certificates bearing the name Pilgrim * * * would not place a reasonable person exercising reasonable diligence on notice of Pilgrim's actions."[13]

It is our opinion that the negligence claims against Pilgrim are time-barred because, in August 2005, plaintiffs were aware of facts that placed them on notice that potential claims existed against Pilgrim. See Behroozi, 128 A.3d at 873. Notably, it is undisputed that Pilgrim's name was on the municipal lien certificates recorded in the Land Evidence Records. Pilgrim's participation in the closing of the sale to Boulder Brook was readily discoverable by plaintiffs as of August 16, 2005. As noted, nine pages of the pertinent recordings located at the Hopkinton Town Hall specifically stated that the certificates had been requested by Pilgrim.

Moreover, as plaintiffs themselves acknowledged in their filings to this Court, "[o]n August 14, 2005, Ottenbacher sent an email to * * * Schmidt, * * * Savage, and others, advising that there was no consent among the shareholders to sell the property and that the [APA] had

---

[13] The plaintiffs also argue that the hearing justice failed to address G.L. 1956 § 9-1-20, which provides accrual of causes of actions when any person "liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action," and its application to this case. However, because plaintiffs did not present this argument to the hearing justice, we will not consider it on appeal. See State v. Saluter, 715 A.2d 1250, 1258 (R.I. 1998) ("It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'") (quoting State v. Gatone, 698 A.2d 230, 242 (R.I. 1997)).

long since lapsed. * * * He advised that they would be committing fraud if they proceeded to closing." The plaintiffs believed, therefore, as soon as they learned from Spangler that a deed conveying the property had been recorded, that they were wronged because they had not consented to or authorized the sale. At that moment, or at any time prior to the expiration of the three-year statute of limitations, plaintiffs were required to inspect and inquire to determine what claims they had against the parties involved in the alleged fraudulent transaction. Instead, and despite being armed with the belief that the sale to Boulder Brook was fraudulent, plaintiffs did not seek to discover who the escrow agent was in this transaction. Both plaintiffs testified that they relied on the bankruptcy attorneys they had hired at that time. The plaintiffs cannot, however, avoid the three-year statute of limitations or seek application of the discovery-rule exception by faulting their attorneys for failing to see the potential claims they had against Pilgrim. This is particularly true given that Fogarty, as a real-estate agent, and Ottenbacher, a real-estate developer, were experienced in real-estate transactions.

Undoubtedly, plaintiffs wholly fail to satisfy the reasonable diligence standard of § 9-1-14.3(2). Because plaintiffs' claims against Pilgrim were filed outside of the three-year statutory period, and because they fail to present any evidence that raises an issue of material fact regarding their diligence in discovering these claims, we affirm the judgment of the Superior Court as it relates to counts 7.

### B

### Defendants Ralph Palumbo and Jonathan Savage

### 1. Damages (All Counts)

Palumbo and Savage filed a joint motion for summary judgment on all counts on the basis that plaintiffs had "failed to demonstrate any form of damages resulting from [their] alleged

actions" and, accordingly, had failed to "establish a prima facie case for any cause of action." The hearing justice agreed, and granted defendants' motion for summary judgment on all counts because plaintiffs had failed to put forth "evidence regarding lost profits to a reasonable degree of certainty."

In his answers to interrogatories posed by Palumbo, Ottenbacher noted that "[b]ecause of * * * [d]efendants' actions, [he] lost [his] intended share of the land owned by Brushy Brook * * * and the profits derived from the land, which would include profits on condominiums, sale of house lots, and revenues generated by a golf course and exercise facility and restaurant." Additionally, he noted that he "would have received repayment of the principal of the debts owed to [him] by Brushy Brook and Stone Ridge but for the actions [and omissions] of [d]efendant Palumbo." At deposition, Ottenbacher stated: "[he] had an opportunity taken away from [him]. [He] was damaged [in] that the money [he] invested in Stone Ridge was never returned to [him], and [he] had the opportunity of taking over the project and probably turning it into a 20 or $30 million operation."

The plaintiffs also retained a real-estate appraiser, James A. Houle, to opine regarding the value of the property and the damages plaintiffs allege to have incurred due to defendants' conduct. In a March 26, 2007 appraisal, Houle appraised value of the property at "$10,000,000" as of 2005. To reach this figure, Houle had to assume that the property's construction approvals, which had been previously granted but had since expired, would be renewed. At deposition, Houle testified that he had "calculated out the full value, retail value, of all the properties and then deducted the expenses that [one] would normally incur to arrive at a residual number which was the value of the property." Houle stated that he was prepared to testify at trial as to the value of the property at the time of the August 2005 conveyance, the costs to develop the property, as

well as the expected profits a developer might have made if the property was developed under a certain series of circumstances.

When asked if he could state "within a reasonable degree of certainty, based upon [his] experience as a developer[,] * * * what the lost profits [were] to * * * Fogarty as he[] [had] claimed in his complaint," Houle replied that he had not "seen the complaint. [He did not] know what [the] purchase price would have been.  [He did not] know what [Fogarty's] financing terms were.  Assuming all things [were] equal to what [he] had projected * * *, [he] could calculate easily what [he] would have projected a developer to not gain or not get if he didn't do the project."  Houle testified that that amount would be "20 percent of * * * the retail sales of the project divided by whatever percentage of ownership."  Because the "property * * * at one time carried extensive approvals for 134 units," he testified that "it certainly would be reasonable to expect if you were doing an appraisal that [the property] could support 90 or 100" units.  Houle also noted that, about one year before he was deposed, and after having stored it for ten years, he destroyed the working file that he prepared for this case.

Additionally, in their attempt to establish that they had incurred damages, plaintiffs also presented a valuation of the condominium site, including construction costs, and a notice that twenty-two single-family lots had been reserved as of October 2004.

In granting summary judgment, the hearing justice noted that plaintiffs alleged to have suffered damages in two ways: (1) as shareholders who "would have received some return of their initial contribution" had their deal been accepted; and (2) lost profits as a result of not purchasing and developing the property.  The hearing justice concluded that plaintiffs lacked standing to recover under the first claim of damages because this was "a claim that Stone Ridge

or its [s]hareholders ought to make," not plaintiffs in their individual capacities.[14] Relating to plaintiffs' claims of lost profits, the hearing justice ultimately decided that plaintiffs' proffered expert witness, Houle, had failed to "support a finding that damages ha[d] been established with a reasonable degree of certainty." Houle had opined that the property fully developed would be valued at over $10,000,000, but the hearing justice believed that any expert testimony regarding lost profits was speculative of whether all building permits would be in place, plaintiffs would be able to obtain necessary financing for the development, and the actual construction costs.

On appeal, plaintiffs argue that the hearing justice erred in determining that there was no factual issue regarding damages. The plaintiffs argue that the hearing justice "failed to view the deposition testimony in the light most favorable to [them]." The plaintiffs claim that the hearing justice instead "consistently considered disputed facts in the light most favorable to the moving party," and failed to view the record in its entirety. The plaintiffs also highlight that all but one of the cases cited by the hearing justice in support of his contention that damages must be based on more than speculation were decided after a trial on the merits, and not at the summary-judgment stage.

The basic precondition for the recovery of lost profits is that such a loss be established "with reasonable certainty." Troutbrook Farm, Inc. v. DeWitt, 611 A.2d 820, 824 (R.I. 1992). Although mathematical precision is not required, the jury should be provided with some rational

---

[14] In their filings to this Court, plaintiffs do not challenge the hearing justice's determination regarding standing; instead, they solely press the issue of damages as it relates to lost profits. Palumbo and Savage contend in their written submission that plaintiff's failure to dispute standing is dispositive of plaintiffs' appeal in its entirety. We disagree. The hearing justice's decision on standing quite clearly only relates to plaintiffs' first theory of damages—that they, as shareholders of Stone Ridge, would have received a return on their initial capital contributions—because the hearing justice ruled that these claims were derivative. The hearing justice's decision continues and addresses the plaintiffs' second theory of damages—lost profits. Having fully briefed their second theory of damages, no such waiver has occurred.

- 14 -

model of how the lost profits occurred and on what basis they have been computed. <u>Abbey Medical/Abbey Rents, Inc. v. Mignacca</u>, 471 A.2d 189, 195 (R.I. 1984). In all counts raised in the complaint, plaintiffs are burdened with establishing that they incurred reasonably certain damages as a consequence of defendants' wrongdoing. <u>See</u> <u>Petrarca v. Fidelity and Casualty Insurance Co.</u>, 884 A.2d 406, 410 (R.I. 2005) (breach of contract); <u>Belliveau Building Corp. v. O'Coin</u>, 763 A.2d 622, 627 (R.I. 2000) (tortious interference with a contractual relationship); <u>Avilla v. Newport Grand Jai Alai LLC</u>, 935 A.2d 91, 98 (R.I. 2007) (interference with a prospective contractual relationship); <u>Cliftex Clothing Co. v. DiSanto</u>, 88 R.I. 338, 344, 148 A.2d 273, 275 (1959) (fraud).

While we by no means depart from our well-established principle that damages must be sufficiently certain, it is our opinion that, in this case, Houle's testimony on damages, coupled with the exhibits submitted, was sufficient to survive summary judgment. The existence of damages, including their certainty, is a question for the factfinder to decide. The plaintiffs in this case did not "simply rest on the allegations and denials in [their] pleadings," but instead presented an expert witness who opined that they suffered damages. <u>Brito v. Capone</u>, 819 A.2d 663, 666 (R.I. 2003). Here, a careful review of Houle's testimony indicates that, although he could not quantify plaintiffs' damages with certainty because he did not have the necessary details of the purported sale, he did supply proof of the existence of damages and a formula by which to compute those damages. In viewing the evidence in the light most favorable to plaintiffs and drawing reasonable inferences therefrom—<u>i.e.</u>, that the building permits would have been renewed and the project would have been financed—we are of the opinion that plaintiffs presented sufficient evidence to survive summary disposition.

The Tennessee Court of Appeals' holding in Patel v. Bayliff, 121 S.W.3d 347 (Tenn. Ct. App. 2003), is instructive and persuasive. In Patel, the Court held the following:

> "'Uncertain * * * damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain. When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required.' * * * '[T]he law does not require exactness of computation in suits that involve questions of damages growing out of contract or tort.' * * * Accordingly, although [the plaintiff] did not quantify [her damages] * * *, she [did] supply proof of the existence of damages, which is sufficient to survive a motion for summary judgment." Id. at 356 (quoting Walker v. Sidney Gilreath & Associates, 40 S.W.3d 66, 72 (Tenn. Ct. App. 2000)).

We are satisfied that the evidence of damages in the form of lost profits presented by plaintiffs was sufficient to survive summary judgment, as plaintiffs supplied proof of the existence of such damages. Therefore, because we do not affirm summary judgment on all counts based on uncertainty of damages as it relates to lost profits, we will address the other grounds upon which defendants moved for summary judgment to determine if they are nevertheless entitled to summary disposition.

### 2. Tortious Interference with a Contractual Relations (Counts 4)

In counts 4, plaintiffs allege that Palumbo and Savage tortiously interfered with their contract with Brushy Brook to purchase the property. The plaintiffs allege that "Palumbo and Savage knew or should have known that [plaintiffs] entered into a contractual relationship in connection with the purchase of [the property]," that Palumbo and Savage intentionally and negligently interfered with such contract, and that this interference caused them to suffer damages. Palumbo and Savage moved for summary judgment on counts 4 on the basis that no contract existed between plaintiffs and Brushy Brook—a legal prerequisite to plaintiffs' claims. The hearing justice agreed and found that "a contract for the sale of the [p]roperty to the

- 16 -

[p]laintiffs ha[d] not been established by the evidence," and thus count 4 of their complaints failed.

In order to establish a claim for tortious interference with a contractual relationship, plaintiffs must establish the following four elements: "(1) [T]he existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." Belliveau Building Corp., 763 A.2d at 627 (quoting Smith Development Corp. v. Bilow Enterprises, Inc., 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). To form a valid contract, there must be "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." Rhode Island Five v. Medical Associates of Bristol County, Inc., 668 A.2d 1250, 1253 (R.I. 1996) (quoting Black's Law Dictionary 322 (6th ed. 1990)). Moreover, in Rhode Island, the statute of frauds requires that, to enforce an agreement for the sale of real property, the agreement must be signed by the party against whom enforcement is sought. See G.L. 1956 § 9-1-4.

The plaintiffs rely on an email from Schmidt to establish the existence of a contract for the purchase of the property. The email is dated August 11, 2005, and reads as follows:

> "[Ottenbacher],
>   "I don't have a functional fax at home presently and [McComb] just read me your letter. In principle, I would agree to sell at $4.1 million and reluctantly agree that SK Capital and [Fogarty] get the specified amounts off the top, in the case of [Fogarty] for [the] sale of his shares to Stone Ridge. I agree that hold[-]harmless clauses will be included with the sale. I don't object to escrow of the funds in a Stone Ridge account. The only thorny issue is the payoff of the creditors of [Brushy Brook], and that will have to [be] taken care of in order to sign this agreement. The other issues I addressed with you a week ago may resolve themselves.
>   "[Schmidt]"

On appeal, plaintiffs argue that the hearing justice erroneously concluded that no contract existed between plaintiffs and Brushy Brook for the sale of the property and that the hearing

justice "ignore[d] the multiple statements of acceptance overtly asserted by the accepting party, Schmidt * * *." Specifically, plaintiffs point to the following language in Schmidt's email: "In principle, I would agree to sell at $4.1 million"; "[I] reluctantly agree that SK Capital and [Fogarty] get the specified amounts off the top * * *"; "I agree that hold[-]harmless clauses will be included with the sale"; and "I don't object to escrow of the funds in a Stone Ridge account." The plaintiffs insist that viewing these statements in the light most favorable to them establishes "offer and acceptance to buy the property, or, in the alternative, a counteroffer on behalf of Schmidt" and, accordingly, warrants a reversal of summary judgment.

It is this Court's opinion that this email, as a matter of law, does not establish the existence of a contract. Although Schmidt agreed on the purchase price "in principle," there are terms like "the payoff of the creditors of [Brushy Brook]" that needed "to [be] taken care of in order to sign th[e] agreement." It is evident that the parties had not yet reached an agreement on material terms. Moreover, it is clear that Schmidt did not intend to enter a contract at that precise moment, as required to constitute a valid acceptance. See Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989); see also Weaver v. American Power Conversion Corp., 863 A.2d 193, 198 (R.I. 2004) ("for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement").

Because plaintiffs failed to present competent evidence of the existence of a contract—a legal prerequisite and factual element to their tortious interference with a contractual relationship claims, we hereby affirm the Superior Court order granting summary judgment as to counts 4.

**3. Intentional Interference with Prospective Contractual Relations (Counts 5)**

The plaintiffs also allege, in counts 5, that they "expected to enter into a beneficial contractual relationship with other individuals and/or entities in connection with the development

- 18 -

of [the property]" and that defendants Palumbo and Savage "knew or should have known" of these prospective contractual relations and that their "intentional and negligent conduct * * * interfered with" their contracts relating to the property. In granting summary judgment, the hearing justice found that it was "clear that these two parties competed in their attempts to acquire the [p]roperty," and that while defendants were victorious, this "[c]ompetition alone [was] not enough to demonstrate tortious interference," so the motion for summary judgment on this basis was also granted.

On appeal, plaintiffs contend that the Vande Werken email, see note 7, supra, when viewed in the light most favorable to them, does not constitute a rejection of their offer to purchase the property. The plaintiffs argue that instead of a "rejection," this email requests clarification of plaintiff's offer in order to compare it to the offer of Savage. The plaintiffs also argue that the evidence they proffered at the summary-judgment stage showed that they were in ongoing negotiations to purchase the property, and that they had an expectation of purchasing the property and entering into a business relationship with Brushy Brook. Palumbo and Savage counter that plaintiffs did not possess a business expectancy associated with developing the property as their "proposal to purchase the [p]roperty was outright rejected and marked as inferior by Brushy Brook," and "[t]herefore, no business relationship or expectancy existed."

"[T]he elements of intentional interference with prospective contractual relations 'are identical to those required to state a claim based on interference with contractual relations, except for the requirement in the latter that an actual contract exist.'" Avilla, 935 A.2d at 98 (quoting Mesolella v. City of Providence, 508 A.2d 661, 670 (R.I. 1986)). A party must establish: "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that

the interference caused the harm sustained, and (5) damages to the plaintiff." Id. (quoting L.A. Ray Realty v. Town Council of Cumberland, 698 A.2d 202, 207 (R.I. 1997)).

We are of the opinion that plaintiffs did not raise an issue of material fact as it relates to their prospects of purchasing the property and entering into a business relationship. Again, as plaintiffs presented no evidence to support the existence of a contract between them and Brushy Brook for the sale of the property, they again present no evidence that there was an ongoing business relationship or expectancy when the parties were negotiating the terms of a sale. We agree with the hearing justice that the evidence established that there were competing buyers for the property; the fact that Palumbo and Savage were ultimately victorious, standing alone, does not present issues of material fact. The plaintiffs fail to present any evidence that they were in a business relationship with Brushy Brook or expected to be (or with any other third party). Accordingly, we affirm summary judgment on counts 5.

### 4. Breach of Contract (Counts 3)

Savage moved for summary judgment on counts 3, 6, and 8 of plaintiffs' complaints on the basis that "there [was] no evidence whatsoever that an attorney-client relationship ever existed" between plaintiffs and him, and, in a separate motion, on the basis that plaintiffs filed their complaints outside of the applicable three-year statute of limitations for legal-malpractice claims. The hearing justice agreed and granted the motions on both grounds. On appeal, plaintiffs contend that the hearing justice "improperly conflated and combined" their legal-malpractice breach-of-contract claims against Savage with their claims for fraud and civil conspiracy, as the two latter claims did not relate to Savage's conduct as their alleged attorney. We need not delve into an analysis of the applicable statute of limitations, however, because we

affirm summary judgment on counts 3 on the grounds that plaintiffs have failed to put forth competent evidence of the existence of an attorney-client relationship with Savage.

In their breach-of-contract claims, plaintiffs allege that they "contracted with Savage, to be [their] legal advisor and to assist [them] in the purchase of, or in securing a purchaser for, the * * * property." They claim that Savage breached their contract and that such breach resulted in damages to plaintiffs. In a breach-of-contract claim, the plaintiff must prove both the existence and breach of a contract, and that the defendant's breach thereof caused the plaintiff's damages. See Petrarca v. Fidelity and Casualty Insurance Co., 884 A.2d 406, 410 (R.I. 2005). The plaintiffs' breach-of-contract claims are premised on their alleged fiduciary attorney-client relationship with Savage.

"To prevail on a legal malpractice claim, a plaintiff must prove by a fair preponderance of the evidence: the defendant's duty of care, a breach of that duty, and damages actually and proximately sustained by the plaintiff as a result of such breach." Richmond Square Capital Corp. v. Mittleman, 773 A.2d 882, 886 (R.I. 2001). Here, the existence of a duty depends on whether an attorney-client relationship existed between plaintiffs and Savage. An "attorney-client relationship * * * is the product of an agreement of the parties and may be implied from their conduct." State v. Austin, 462 A.2d 359, 362 (R.I. 1983).

We agree with the hearing justice that "[p]laintiffs' mere allegation that Savage was their attorney without other corroborating evidence does not prevent the granting of a summary judgment motion." The plaintiffs rely on the fact that Clavell drafted the buyout agreement, whereby plaintiffs would buy out Schmidt and McComb's interest in Stone Ridge, as evidence that an attorney-client relationship existed between plaintiffs and Savage. However, it was Fogarty's understanding that plaintiffs would then sell the property to Savage. Additionally, in

his deposition, Ottenbacher testified that he first met Savage in November 2004 to obtain financing so that Ottenbacher and Fogarty could buy out their two partners, and that Savage went from "being a lender to * * * being a buyer" in December 2004 or the beginning of 2005. He also testified that he met with Savage, Fogarty, and Palumbo in March or April 2005 to discuss Savage's purchase of the property.

Moreover, integral parties to the transaction testified at deposition that at all times Savage was a purchaser of the property. Ottenbacher, in his deposition during the bankruptcy proceedings, indicated that he began to work with Savage as a purchaser of the property as early as November 2004. Vande Werken also testified that plaintiffs never represented to him that Savage was their attorney. Pisaturo also understood Savage to be the buyer, and that Savage had been negotiating with a member from Brushy Brook on the purchase price and terms.

After reviewing the record, we agree with the hearing justice that plaintiffs have failed to present evidence that Savage was acting as their attorney. Accordingly, we affirm summary judgment as to counts 3 against Savage.

### 5. Fraud (Counts 6)

In their fraud claims, plaintiffs allege that Palumbo and Savage "made false representations about material facts, and/or failed to disclose facts and/or information" to them. They allege that "Palumbo and Savage had a relation[ship] of trust and confidence with [them], and therefore, had a duty to disclose their/its involvement with Boulder Brook * * * and/or Boulder Brook['s] * * * intention to purchase the [property]." They further allege that, "as fiduciaries to [Brushy] Brook and Stone Ridge," Palumbo and Savage "had a duty to disclose to its members and shareholders" Schmidt's plan to defraud them. They also assert that, "Palumbo and Savage, as fiduciaries to [them], had a duty to disclose Schmidt's plan * * *." They claim

that Palumbo and Savage "made false representations about material facts, and/or failed to disclose facts or information to" them. They list the following conduct which they claim constitute Palumbo and Savage's "participat[ion] in the fraud[:]"

> "a.) Undertaking, and being compensated, to secure third party buyers for the subject property while conspiring to obtain the property for themselves;
> "b.) Collusion with Schmidt to defraud Fogarty, Ottenbacher and Kaufman;
> "c.) Preparation of a sham Asset Purchase Agreement designed to defraud the closing agent, Pilgrim Title, in order to effectuate the transfer of title to property which was the subject of a pre-existing Purchase and Sales Agreement;
> "d.) Obtaining said property by false pretenses, to wit, a fraudulent deed all in violation of R.I. Gen. Laws Sec. 11-41-4; and
> "e.) Preparation or dissemination of fraudulent documents, including the Asset Purchase Agreement, documents reflecting Consent of Shareholders or Members, Purchase and Sale Agreement, or other false financial documents necessary for and intended to obtain credit, in violation of R.I. Gen. Laws Sec. 11-18-6."

"To establish a prima facie fraud claim, 'the plaintiff must prove that the defendant made a false representation intending thereby to induce [the] plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage.'" McNulty v. Chip, 116 A.3d 173, 182-83 (R.I. 2015) (quoting Parker v. Byrne, 996 A.2d 627, 634 (R.I. 2010)).

It is our opinion that the fraud claims are derivative claims and that plaintiffs lack standing to raise them. The relevant inquiry, in determining whether a claim is derivative, is two-fold: "(1) who suffered the alleged harm ([Brushy Brook] or the suing [shareholders], individually); and (2) who would receive the benefit of any recovery or other remedy ([Brushy Brook] or the [shareholders], individually)?" Heritage Healthcare Services, Inc. v. Beacon Mutual Insurance Co., 109 A.3d 373, 378 (R.I. 2015) (quoting Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004). "If [Brushy Brook] suffered the harm and

- 23 -

would be entitled to receive the requested relief, the claim is derivative." Id. "Conversely, the claim is direct if the plaintiffs can demonstrate that they have suffered harm 'independent of any alleged injury to [Brushy Brook]' that would entitle them to an individualized recovery. Id. (quoting Tooley, 845 A.2d at 1039).

Clearly, plaintiffs' claims that Palumbo and Savage, "as fiduciaries of B[r]ushy Brook and Stone Ridge, had a duty to disclose to its members and shareholders" Schmidt's plan to defraud them, fail as derivative claims on its face. (Emphasis added.) Any duty owed, as plaintiffs themselves articulate, are owed to Brushy Brook and Stone Ridge. Moreover, in listing the alleged specific fraudulent behavior on the part of Palumbo and Savage, plaintiffs list the fact that Palumbo and Savage were hired to find a third-party purchaser for the property and that they ultimately purchased the property for themselves. Even if that allegation is true, when Palumbo and Savage were hired to obtain a buyer, the seller and legal owner of the property was Brushy Brook, not plaintiffs, individually. Accordingly, any wrong relating to their failure to secure a buyer and instead purchasing the property for themselves was against Brushy Brook, not plaintiffs individually. Similarly, the allegations that Palumbo and Savage defrauded the closing agent, Pilgrim, obtained the property by false pretenses, and prepared a fraudulent asset purchase agreement are all claims that caused injury to Brushy Brook, as the entity with legal ownership and interest in the property.

Because we hold that these claims are derivative, and because both Stone Ridge and Brushy Brook were petitioned to Bankruptcy Court, plaintiffs lack standing to bring these claims. See In Re The 1031 Tax Group, LLC, 397 B.R. 670, 680-81 (Bankr. S.D.N.Y. 2008). The appointed trustee, Pisaturo, became the only party with standing to bring any lawsuits for damages arising from wrongs alleged to have been occasioned by the seller, Brushy Brook, and

- 24 -

its sole member, Stone Ridge. See id.  Notably, plaintiffs do not challenge on appeal the hearing justice's determination that they lack standing to pursue derivative claims.

Accordingly, because plaintiffs lack standing to bring any claim alleging wrongs done to Brushy Brook or Stone Ridge, summary judgment as to counts 6 is also affirmed.

### 6. Civil Conspiracy (Counts 8)

Finally, in their civil-conspiracy claims, the plaintiffs allege that the actions of Palumbo and Savage in acquiring the property "constitute[d] an unlawful enterprise."[15]  However, because the intentional tort of civil conspiracy is not an independent basis of liability, and, instead, "[i]t is a means for establishing joint liability for other tortious conduct[,] * * * it 'requires a valid underlying intentional tort theory.'" Read & Lundy, Inc. v. Washington Trust Co. of Westerly, 840 A.2d 1099, 1102 (R.I. 2004) (quoting Guilbeault v. R.J. Reynolds Tobacco Co., 84 F.Supp.2d 263, 268 (D.R.I. 2000)).  Because no intentional tort theory survives summary disposition, we need not analyze the plaintiffs' civil-conspiracy claims.

### V

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court in part and we vacate the judgement in part.  We vacate the grant of Palumbo and Savage's joint motion for summary judgment on all counts on the grounds that the plaintiffs failed to demonstrate damages, but only to the extent that the plaintiffs may show damages for lost profits sustained in their individual capacities and not as shareholders or members of Stone Ridge or Brushy Brook. We affirm said judgment to the extent that the plaintiffs' claims for damages are derivative in

---

[15] The only substantive difference between plaintiffs' complaints is found in counts 8. When listing Palumbo and Savage's conduct that plaintiffs allege "constitute an unlawful enterprise," Fogarty, but not Savage, includes the following: "Preparation and issuance of a 1099C tax form to Fogarty in an attempt to extort Fogarty."

nature.  We affirm the judgment, therefore, in favor of Palumbo and Savage on counts 6 (fraud) and counts 8 (civil conspiracy).  We affirm the grant of the defendants' motion for summary judgment concerning counts 4 (tortious interference with contractual relations) and counts 5 (tortious interference with prospective contractual relationship) in all respects.  We affirm the grant of Savage's motions for summary judgment concerning counts 3 (breach of contract), on the grounds that the plaintiffs failed to put forth competent evidence that an attorney-client relationship existed.  Finally, we affirm the judgment in favor of Pilgrim in all respects.

Accordingly, we remand the record to the Superior Court for further proceedings with respect to the plaintiffs' claims against Palumbo on counts 1 and 3.

Justices Robinson and Indeglia did not participate.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Charles E. Fogarty v. Ralph Palumbo et al. <br><br> James Ottenbacher v. Ralph Palumbo et al. |
| **Case Number** | No. 2015-271-Appeal. <br> No. 2015-291-Appeal. <br> (KB 08-1073) <br><br> No. 2015-273-Appeal. <br> No. 2015-292-Appeal. <br> (KB 08-1087) |
| **Date Opinion Filed** | June 23, 2017 |
| **Justices** | Suttell, C.J., Goldberg, and Flaherty, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For Plaintiffs: <br><br> Michael T. Finan, Esq. <br> Carol L. Ricker, Esq. <br> Philip Laffey, Esq. <br><br> For Defendants: <br><br> Vincent A. Indeglia, Esq. <br> Patricia A. Buckley, Esq. <br> Ryan J. Lutrario, Esq. |

SU-CMS-02A (revised June 2016)