June 17, 2019

**Supreme Court**

No. 2016-282-Appeal.
(PC 15-1779)

La Gondola, Inc.               :

v.                             :

City of Providence, by and through its     :
  Treasurer James J. Lombardi, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2016-282-Appeal.
(PC 15-1779)
(Dissent begins on Page 30)

La Gondola, Inc.                    :

v.                    :

City of Providence, by and through its    :
  Treasurer James J. Lombardi, et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The plaintiff, La Gondola, Inc. (La Gondola), appeals from a September 14, 2016 judgment entered after a bench trial in Providence County Superior Court, which judgment was in favor of the defendants, the City of Providence (the City), the Rhode Island Zoological Society (the Zoo), P.G.S., Inc., and various municipal officials.[1]  The case concerns the awarding of a concessions contract for concessions at Carousel Village in Roger Williams Park, which is located in the City of Providence.  On appeal, La Gondola contends that the trial justice erred in: (1) "concluding that the [bidding] process was free of corruption, bad faith, and/or an abuse of discretion;" (2) holding that a certain amendment to the contract at issue, which dealt with the operation of a trackless train, was not enforceable; and (3) denying La Gondola's "contractual interference claim."  (Internal quotation marks omitted.)

---

[1]    The municipal officials named as defendants are: Robert F. McMahon, in his capacity as Superintendent of the City of Providence Department of Parks & Recreation; Wendy Nilsson, in her capacity as Superintendent of the City of Providence Department of Parks & Recreation; Mayor Jorge O. Elorza, in his capacity as Chairman of the City of Providence Board of Contract and Supply; and Alan Sepe, in his capacity as Director of Operations for the City of Providence.

- 1 -

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

Roger Williams Park is a spacious and inviting public space owned by the City of Providence. Situated on four hundred and thirty-five acres, it contains numerous public attractions such as the Roger Williams Park Zoo, Carousel Village, and the Dalrymple Boathouse (the Boathouse).[2] This case involves a dispute over the concessions contract for Carousel Village, which contract the City ultimately awarded to the Zoo, rather than to La Gondola. We begin by addressing what La Gondola alleged in its March 1, 2016 third amended complaint (the complaint), and we will then proceed to relate the testimony presented at trial.

In its complaint, La Gondola stated that it operated concessions at the Boathouse in Roger Williams Park pursuant to a concessions contract, the initial term of which will expire on May 16, 2021. The complaint further stated that La Gondola also operated concessions at Carousel Village pursuant to a concessions contract with the City, the initial term of which ended on April 30, 2015, "with an additional five year term that was to expire on April 30, 2020 if the rent was mutually agreed upon by the City and LaGondola prior to April 30, 2015."

At some point during the pendency of the latter contract, La Gondola purchased a trackless train, which would serve as an attraction at Carousel Village. The complaint alleged that, on January 30, 2014, after the train was purchased, La Gondola and the City entered into an "Amendment to the Carousel Village Lease" (the Train Amendment), which stated that La Gondola would "remain exclusive provider of all train rides within Roger Williams Park and Zoo

---

[2] *See* Roger Williams Park, http://www.providenceri.gov/providence-parks/roger-williams-park/ (last visited on June 14, 2019).

under this or any other current contract with the City of Providence within Roger Williams Park and Zoo."

The complaint went on to relate that, at the time period at issue, a contract which existed between the Zoo and the City for the operation of the Zoo was set to expire on June 30, 2015. It was further stated in the complaint that Robert McMahon, the Superintendent of the City of Providence Department of Parks & Recreation, who recommended that the City award the Carousel Village concessions contract to the Zoo, was also an *ex-officio* member of the Zoo's Board of Trustees, which Board was involved in negotiating a new contract between the City and the Zoo.[3] (La Gondola gives great weight to that uncontested fact in its argument before this Court.) The complaint proceeded to state that the City informed the Zoo that it was going to reduce its annual payments to the Zoo by $300,000 beginning in fiscal year 2015. It then alleged that the Zoo agreed to the reduction "so long as the City provided the [Zoo] with other sources of revenue" and that the parties discussed the Zoo operating the concessions at Carousel Village and the Boathouse. The complaint pointed to specific communications from Doctor Jeremy Goodman, the Executive Director of the Zoo, to Mr. McMahon and Alan Sepe, the Director of Operations for the City, indicating that the City had "verbally committed" to granting the Zoo the Carousel Village concessions contract. *See* Part III.A.2, *infra*.

In relating the factual background of this case, the complaint went on to state that, in November of 2014, Mr. McMahon met with Cynthia and Allen Days (Cynthia Days being the President of La Gondola and Allen Days being both her husband and also a person affiliated with the corporation) to discuss the possible five-year extension of the concessions contract for

---

[3] We note that the City provided this Court with a copy of the "Lease and Operating Agreement Between the City of Providence and the Rhode Island Zoological Society" dated July 13, 2005, which agreement provides that "[t]he Superintendent shall serve as an ex-officio member of the [Zoo's] Board of Trustees."

Carousel Village and the need for capital improvements to Carousel Village. The Days wanted a contractual extension for a period greater than five years if they were to agree to pay for the needed capital improvements. The complaint stated that Mr. McMahon told the Days that such an extension would have to be the subject of a request for proposal. Accordingly, the complaint indicated that, on December 15, 2014, the Board of Contract and Supply approved a "Request For Proposals For Operation Of Carousel Village At Roger Williams Park" (the RFP).

The RFP provided for a ten-year contract with a minimum rent bid of $95,000. It also included required capital improvements totaling $156,000; those improvements included a restroom renovation to, among other things, convert the conventional toilet system into a waterless Clivus Multrum System, which is a composting toilet system. Two addenda were ultimately added to the RFP. The first addendum made certain changes to the scope of needed capital improvements, the cost of which then totaled $241,000. The second addendum made the contract be one of twenty, rather than ten, years in duration; and it extended the time period for completion of the capital improvements from two years to three and a half years.

Importantly, the RFP also stated that "[t]he Parks Department reserves the right to accept or reject any or all proposals received as a result of this request, or to cancel in part or in its entirety this proposal if it is in the Parks Department best interest to do so." Section 6.7 of the RFP further provided that "[t]he City reserves the right to accept other than the highest value proposals, to reject any or all proposals, and to waive any of the requirements of the bid selection procedures explained in this document."

According to the complaint, P.G.S., Inc. submitted a proposal for $292,435, which was an amount less than the required minimum bid (*viz.*, the minimum rent of $95,000 plus capital improvements of $241,000). La Gondola submitted a bid of $525,569, which committed it to

performing all of the required capital improvements. The Zoo submitted a bid of $591,000, which bid met the $241,000 required for capital improvements that were listed in the RFP but did not include the capital improvement relative to the installation of the Clivus Multrum System.[4] For that reason, La Gondola alleges that the Zoo's bid was unresponsive to the RFP. The complaint proceeded to state that Mr. McMahon recommended that the City accept the Zoo's bid and that the Board of Contract and Supply so voted. Ultimately, on August 21, 2015, the City and the Zoo entered into a concessions contract for Carousel Village, which will expire in 2035.

The complaint contained six counts. We relate in detail only those counts with which we are concerned in this appeal. Count One requested a declaratory judgment to the effect that: (1) the Zoo's bid was not responsive to the RFP; (2) the Zoo's bid materially deviated from the specifications of the RFP; (3) the City engaged in favoritism in selecting the Zoo's bid; (4) the City colluded with the Zoo in selecting the Zoo's bid; (5) the City predetermined that it was going to select the Zoo's bid; (6) "the City acted corruptly or in bad faith, or so unreasonably or arbitrarily as to be guilty of a palpable abuse of discretion;" (7) the concessions contract between the City and the Zoo was void; (8) La Gondola's bid was responsive; (9) La Gondola's bid "should be selected as the successful bid for the RFP;" (10) the Zoo should be ordered to vacate

---

[4]     The Zoo's bid specifically stated as follows:

> "[The Zoo] does not believe the installation of a composting toilet is necessary for the operation of the carousel concessions as there are four bathroom stalls in the ladies room and two stalls and two urinals in the men's room. The [Zoo] commits to all other capital investment required in the RFP and commits to the entire allowance of $241,000 over the first 3.5 years. In lieu of the composting toilet, a capital investment will be made to repair gutters, provide additional picnic tables, new signage, parking lot striping and other amenities to improve the area."

Carousel Village; and (11) La Gondola should be awarded the operation of the concessions at Carousel Village. Count Two sought a writ of mandamus "directing the City to award the RFP to LaGondola and * * * to enter into a contract with LaGondola for the Carousel Village" concessions. Count Three sought a declaratory judgment with respect to the fact that the contract eventually entered into between the Zoo and the City for the Carousel Village concessions provided the Zoo the exclusive right to operate rides and concessions at Carousel Village, allegedly in contravention of the Train Amendment (*see supra*). Specifically, La Gondola requested a declaration that: (1) the Train Amendment was valid and enforceable; (2) the concessions contract between the Zoo and the City was void and unenforceable "to the extent that it conflicts with LaGondola's rights under [the Train Amendment] and the Boathouse [concessions contract];" (3) the concessions contract between the City and the Zoo exceeded the geographical limitations set forth in the RFP; (4) La Gondola can operate its train within two hundred feet of Carousel Village; and (5) the Zoo may not operate a trackless train in Roger Williams Park and Zoo. Count Six alleged intentional interference with prospective contractual relations.[5]

A trial ensued on all counts in the complaint over eight days in March and April of 2016. We relate below the salient details of what transpired at the trial.

---

[5] The remaining counts sought a declaratory judgment with respect to the concessions at the Boathouse and alleged breach of contract and breach of the duty of good faith and fair dealing. The Zoo also filed a counterclaim against La Gondola and a cross-claim against the City, "Mayor Jorge O. Elorza[,] in his capacity as Chairmain [*sic*] of the Board of Contract and Supply, Wendy Nillson[,] in her capacity as Superintendent of Parks, and James J. Lombardi in his capacity as Treasurer[.]" None of the remaining counts of the complaint, the counterclaim, or the cross-claim were raised in this appeal; and, as such, we focus only on those counts which are at issue on appeal.

# A

## The Testimony of Robert McMahon

Robert McMahon testified that he had been the Deputy Superintendent of the City of Providence Parks & Recreation Department from 1986 to 2008 and then Superintendent from 2008 until his retirement in 2015. He stated in the course of his testimony that the Parks & Recreation Department oversees Roger Williams Park and that, as Superintendent, his direct superior was Alan Sepe, the Director of Operations for the City. He testified that, in his capacity as Superintendent, he served as an "ex officio member" of the Zoo's Board of Trustees and that, while he was not a voting member, he might "sometimes weigh in on zoo renovations [and] proposed projects that were being considered."

It was Mr. McMahon's testimony that, on occasion, when awarding a contract, bidders "still might get the bid" even "if they didn't completely match every specification or requirement;" he added that that would be "[b]ecause some of the RFPs were discretionary in nature and involved discretion in terms of awarding the bid." He stated that, if a bidder "met substantially all the requirements of the RFP but did not meet one of them, there would be discretion involved in awarding that bid."

It was further Mr. McMahon's testimony with respect to the trackless train that La Gondola had performed "some renovations" to a nearby tunnel for use with respect to the train rides. He added that he had read and signed the Train Amendment.

It was further his testimony that the City's $300,000 reduction in funding to the Zoo was "not a negotiation[.]" He further stated that, after that reduction became known, Dr. Goodman stated that "they would need to look at all other concessions operating in the park to see whether they could take them over and offset the loss" and that Dr. Goodman was interested in Carousel

Village and the Boathouse. Mr. McMahon stated in his testimony that he told Dr. Goodman that those two concessions were already under contract; his testimony reflects the fact that he told Dr. Goodman multiple times that the Carousel Village concessions were under contract. He added that, despite having been advised of that fact, Dr. Goodman proposed including the Carousel Village concessions in the Zoo's new contract with the City.

In the course of testifying with respect to an October 23, 2014 email which he had received from Dr. Goodman, Mr. McMahon stated that the Zoo accepted the loss in revenue from the City "[b]ecause they felt that the city was going to continue to work with them to provide them additional revenue opportunities." He further stated that, in response to an October 8, 2014 email, he told Dr. Goodman that there was a "loophole" in the concessions contract with La Gondola with respect to Carousel Village; he testified that he "realized that the [2020] end date of the [La Gondola] contract with [respect to] Carousel Village was just an option, if it * * * was to go beyond 2015." He added that that option "had to be exercised by both parties."

It was Mr. McMahon's subsequent testimony that he met with the Days in early November of 2014 and told them that the Carousel Village concessions contract would "probably be going out to bid again with an RFP that incorporated capital improvements into the work of the RFP." He added that the Days were "disappointed" but that they did not offer "any other kind of proposal." Mr. McMahon stated that he did not simply recommend an extension of La Gondola's contract for the Carousel Village concessions beyond the five-year option, which longer extension the complaint alleged La Gondola had requested; he added that he did not make such a recommendation because he "felt the capital improvements and the rent were going to far exceed what [La Gondola was] going to be offering." With respect to the five-year extension option on La Gondola's Carousel Village concessions contract, Mr. McMahon testified that, in

- 8 -

October of 2014, he asked the Days for their rent proposal and did not receive a formal response until March of 2015.

It was Mr. McMahon's subsequent testimony that he prepared the RFP. He also stated that it was his understanding that Section 6.7 of the RFP allowed the City to waive particular requirements relative to the bid selection process. With respect to the Zoo's resulting bid, Mr. McMahon testified that the omission of the composting toilet "was a relatively minor item compared to all of the other items in the bid." It was his testimony that the Zoo's bid, "in totality," exceeded La Gondola's bid.

On cross-examination, Mr. McMahon testified that no one from the City administration told him to issue the RFP and that he decided to do so on his own, in consultation with Karen Gomez, the Department of Parks & Recreation's "fiscal person." He stated that, in recommending that the Zoo be awarded the contract, he took into account the fact that the Zoo "submitted a superior bid with respect to dollars," while, in contrast to the Zoo's bid, "the Days didn't propose [to] start paying rent until year 11." He further stated that the Zoo's bid offered "the best financial deal" for the City.

**B**

**The Testimony of Dr. Jeremy Goodman**

Doctor Goodman testified that it was in December of 2013 or January of 2014 when he first became aware of a "problem" with the City's funding of the Zoo "as far as the city's desire to alter the agreement to try to decrease payments." He further stated that, at a meeting attended by several of the Zoo's board members, Mr. McMahon, and Mr. Sepe in March or April of 2014, he expressed a desire "to take over revenue generating opportunities in the park;" he added that Carousel Village, the park's concessions, boating, and a ropes course were all mentioned. He

stated that the "only discussion at that moment was to explore those concessions and their availability," although he acknowledged later in his testimony that there was a discussion about incorporating the Carousel Village concessions into the new lease agreement between the Zoo and the City. He added that he believed that Mr. Sepe asked Mr. McMahon to look into whether or not there was an "out clause" in the contract between the City and La Gondola with respect to the Carousel Village concessions.

La Gondola also points to the following testimony by Dr. Goodman with respect to the Zoo's response to the decrease in City funding: "[W]e also stated that we would need potential revenue generating opportunities in the park and desired to have a new agreement put into place, you know, in exchange for taking a $300,000 cut from what the city owed us."

Doctor Goodman further testified that, from his perspective, he was engaged in negotiations to press for the Carousel Village concessions being incorporated into the Zoo's new lease, stating that the concessions "were something that we had desired to have, so we kept on insisting." He also stated that Mr. McMahon told him in the Summer of 2014 that the Carousel Village concessions contract would have to go out to bid.

Importantly, Dr. Goodman testified on cross-examination that no one from the City, including Mayor Elorza, Mr. Sepe, or Mr. McMahon, had promised the Zoo the Carousel Village concessions contract prior to the final award of the bid. He added that he "had a certain lack of trust with [Mr.] McMahon," because he was afraid that Mr. McMahon "was doing everything in his power to try to keep the Carousel Village with the current vendor * * *."

## C

### The Testimony of Alan Sepe

Alan Sepe testified that, typically, if a bid did not meet the specifications of the RFP, "you'd look at the next bidder * * *." However, he further stated that he considered the "financial aspect" of the Zoo's bid to be "whole" despite the fact that it did not include the Clivus Multrum System, since the bid did include the same amount of money for capital improvements as was requested in the RFP—"they just had a different opinion as far as where the money should go." He further testified on cross-examination that the City's funding to the Zoo was reduced before the Carousel Village concessions even went out to bid. It was also his testimony on cross-examination that, to his knowledge, no one from the City guaranteed any concessions to the Zoo.

## D

### The Testimony of Allen Days

Allen Days testified that La Gondola began operating a trackless train at Carousel Village in early April of 2013. He further testified that La Gondola invested about twenty thousand dollars in renovating an existing tunnel for the trackless train ride. It was his testimony that he requested the inclusion of the Train Amendment in La Gondola's Carousel Village concessions contract in December of 2013. He added that he was never asked to sign the Train Amendment by anyone from the Parks & Recreation Department and that he did not believe he needed to sign it for it to be effective.

According to the testimony of Mr. Days on cross-examination, La Gondola did not respond until March 23, 2015 to the City's October 2014 request for a rent proposal for the potential five-year extension of La Gondola's Carousel Village contract with the City because,

after consultation with an attorney, that rent proposal was to be La Gondola's "fallback position."

Subsequent to the completion of the bench trial, on August 12, 2016, the trial justice issued a written decision. He declined to render the declaratory judgments sought by La Gondola in Counts One and Three of the complaint. He declined to issue the writ of mandamus requested in Count Two, and he entered judgment in favor of the Zoo on Count Six, which had alleged intentional interference with prospective contractual relations. On September 14, 2016, judgment entered to that effect. La Gondola filed a timely notice of appeal.

## II

### Standard of Review

We have stated that "[a] decision to grant or deny declaratory or injunctive relief is addressed to the sound discretion of the trial justice and will not be disturbed on appeal unless the record demonstrates a clear abuse of discretion or the trial justice committed an error of law." *Kayak Centre at Wickford Cove, LLC v. Town of Narragansett*, 116 A.3d 250, 253 (R.I. 2015) (internal quotation marks omitted).

What is more, this Court applies "a deferential standard of review with respect to the factual findings of a trial justice sitting without a jury in a civil case." *B.S. International Ltd. v. JMAM, LLC*, 13 A.3d 1057, 1062 (R.I. 2011). "[W]e will not disturb factual findings unless the record shows that the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence on a controlling issue." *Id.* (internal quotation marks omitted); *see also Muschiano v. Travers*, 973 A.2d 515, 521 (R.I. 2009) (stating that, in reviewing the writ of mandamus granted by the Superior Court, we "apply our usual standard of review to the

- 12 -

findings of the trial court"). However, "[o]n questions of law * * * our standard is one of *de novo* review." *Kayak Centre*, 116 A.3d at 253.

## III

## Analysis

## A

## The Trial Justice's Determination of Lack of Corruption, Bad Faith, or Abuse of Discretion

### 1. The Decision of the Trial Justice

The trial justice in the instant case issued a comprehensive written decision detailing sixty-six findings of fact.[6] He then found "by a preponderance of the evidence that the City's declared intent to reduce payments to [the Zoo] caused [the Zoo] to urge the City to assist it in finding ways to increase [the Zoo's] revenues." He further stated that "[d]iscussions between the Zoo's director (Dr. Goodman) and Mr. McMahon led to the Parks Department furnishing to the Zoo director copies of the existing concession contracts" and that, "[i]n its discussions and communications with the Park superintendent, the Zoo pressed for the handing over to it of the Carousel Village Concession; indeed, even asking that it be included as part of the Zoo contract [with the City]." The trial justice also specifically addressed the fact that "Dr. Goodman in

---

[6]     We note that the trial justice found as a fact that La Gondola's bid "included a dollar for dollar rent abatement against the completed capital improvements." He further found that "Mr. McMahon ignored La Gondola's request for abatement and thereby treated the bid as responsive, and represented the entire $525,569.00 to the Board of Contract and Supply." There appears to be disagreement among the parties before this Court as to the existence of a rent abatement proposal in La Gondola's bid. In deciding this case on appeal, we will ignore, as Mr. McMahon did, any potential rent abatement in La Gondola's bid (without making any determination as to whether or not the bid provides for rent abatement), due to the fact that the existence or non-existence of rent abatement in the bid would not alter our conclusion in this case. We are unable to perceive any error on the part of the trial justice even when we treat La Gondola's bid as totaling $525,569.

communications to the City even referred to alleged verbal commitments from City officials to hand over the Carousel Village Concession to the Zoo," but the trial justice found that there was "no evidence of either an affirmation or denial by City officials of any such commitment in written communications between the City and the Zoo."

The trial justice subsequently held as follows:

> "Based upon the Court's findings of fact, this Court cannot conclude that in any of the actions contested by Plaintiff has it identified corruption or bad faith as Plaintiff has defined those terms or as those terms generally are construed. There was neither a suggestion of corruption nor a scintilla of evidence suggesting corruption or bad faith in any testimony or exhibit admitted during the trial."

The trial justice then proceeded to address whether or not there was an abuse of discretion by the City or city officials. He stated that the record indicated that Mr. McMahon "had attempted to divert the Zoo's interest in the Carousel concession by reminding it that Plaintiff was a small, family business," and he noted that La Gondola had "obtained amendments to the RFP which it believed was to its benefit." He further pointed out that the absence of the Clivus Multrum System in the Zoo's bid "did not result in a cost saving to the Zoo * * *." As such, he found as follows:

> "Our jurisprudence certainly affords public officials involved in procurement (and by analogy) in the awarding of concessions a certain amount of discretion and does not tie their hands in legalistic knots. The RFP here announced to all the reservation of certain rights with respect to the bidding procedures and process. Certainly, in the opinion of this Court, it permitted the determination by the City that despite the omission of the Clivus Multrum waterless toilet the Zoo's bid substantially met the RFP requirements and the ensuing determination that selection of the Zoo was in the best interest of the City. Accordingly, this Court does not find that the awarding of the bid with respect to the Carousel Village concession was a result of corruption, bad faith or a palpable abuse of discretion on the part of the City or any of the Defendants named in their representative capacities."

- 14 -

The trial justice added that "[o]ur Supreme Court has admonished trial court judges not to substitute their judgment for that of the officials charged with municipal contracting."

Lastly, the trial justice addressed the potential five-year extension of the Carousel Village concessions contract between La Gondola and the City, stating that "there [was] no assurance that even with good faith bargaining and negotiations on both sides that an agreement ever would have been reached with respect to rental for an ensuing five year period."

## 2. La Gondola's Contentions on Appeal

La Gondola contends on appeal that, "where the city official who prepared the RFP, evaluated the responsive bids, and made the selection on the award was at all pertinent times a member of the board of the successful bidder (which had submitted a non-conforming bid), and where the successful bidder and the City had colluded on the outcome of the bid process, the trial justice erred in concluding that the process was free of corruption, bad faith, and/or an abuse of discretion." (Internal quotation marks omitted.) La Gondola asserts that there was some sort of "quid pro quo" between the Zoo and the City and that the award of the concessions contract to the Zoo was a "done deal." In La Gondola's opinion, the City "excused the serious deficiency in [the Zoo's] Carousel bid" and the trial justice "erred in failing to give proper weight to the substantial defect in the [Zoo's] bid * * *." La Gondola further avers that the trial justice "simply ignored all evidence demonstrating that [the Zoo] had induced the City to break its relationship with La Gondola, that the Carousel Village contract was quid pro quo for the City's ability to reduce its payments to [the Zoo], [and] that McMahon, Sepe, and Goodman worked together to rig the process to deliver the Carousel to [the Zoo] * * *."

La Gondola further points to numerous exhibits at trial to support its assertions. We have considered at length all the evidence on which La Gondola relies; however, for the sake of

reasonable brevity, we shall limit ourselves to detailing the pertinent portions of only the most salient documents.

On May 27, 2014, Dr. Goodman emailed Mr. McMahon and attached "[h]ighlights" of the proposed new contract between the Zoo and the City. In those "[h]ighlights," it is stated that the contract would "allow[ ] the zoo to assume operations of the carousel park, park's food concessions and paddleboats."

On June 20, 2014, Dr. Goodman again sent Mr. McMahon and Mr. Sepe an email to which he attached an updated draft of the "highlights" of the proposed new contract between the City and the Zoo. It included the following statement: "City will allow the [Zoo] to assume operations of the carousel park, park's food concessions and paddleboats * * *."

On August 22, 2014, Dr. Goodman again emailed Mr. McMahon, stating that "[t]he [Zoo's] assuming the carousel and food operations beginning on January 1, 2015 is critical to the agreement as revenue from this operation is needed to decrease the City's payment in 2015 by $300,000. This was the verbal commitment made by each party when we first met."

In an October 8, 2014 email from Dr. Goodman to Mr. McMahon, Dr. Goodman reiterated that the Zoo made a "verbal commitment" to accept the decrease in the City's funding to the Zoo if the City would "commit to providing the [Zoo] with additional revenue streams in the park as part of a long term agreement." Doctor Goodman further stated as follows:

> "Adding the carousel to the zoo's operation is critical to establishing an aerial obstacle course in that area of the park. Both of these operations were critical in the [Zoo's] strategic business plan to allow the zoo to absorb a significant decrease in City funding in 2015. Without this key piece that was verbally committed to by the City, the [Zoo] will not be able to honor its verbal commitment to modify the existing written contract."

On October 10, 2014, Mr. McMahon emailed Dr. Goodman to tell him that "the City is committed to providing the Zoo with the opportunity to gain additional revenue in the park" and stating that the five-year extension on La Gondola's Carousel Village concessions contract was "only an option that would require the City and the lessee to agree on new terms." He further stated that, for that reason, "we do have a loop hole to go out to bid on a new Carousel operator for a new lease starting in May 2015."

Subsequently, on October 23, 2014, Dr. Goodman emailed Mr. McMahon, stating that a scheduled payment from the City to the Zoo was "short" and stating that the Zoo did not "waive its right to the full amount owed contractually should the city be unable to move forward with their verbal commitments." Mr. McMahon replied: "I just spoke with [Mr. Sepe] and everything is good and we are continuing to move forward."

La Gondola also points to the fact that none of Dr. Goodman's references to a verbal commitment in his various email messages were refuted. La Gondola further alleges that, with respect to the five-year extension of its Carousel Village concessions contract with the City, the City "declined to enter into the good faith price negotiations that the agreement contemplated."

### 3. Discussion

In this Court's opinion in *Kayak Centre*, we held that G.L. 1956 § 45-55-5, which details the procedure for competitive sealed bidding with respect to municipal contracts and which states that "[t]he contract shall be awarded * * * to the responsive and responsible bidder whose bid is either the lowest bid price, or lowest evaluated or responsive bid price," was not applicable to concessions contracts. *Kayak Centre*, 116 A.3d at 254. Rather, we determined as follows:

> "'[I]n the absence of any legislative requirement pertaining to competitive bidding, it is the duty of the appropriate public officials to act honestly and in good faith as they determine which bidder would best serve the public interest.' *Gilbane* [*Building Co.*

> *v. Board of Trustees of State Colleges*], 107 R.I. [295,] 299-300, 267 A.2d [396,] 399 [(1970)]. There can be no dispute that this standard results in a certain amount of deference to government officials; indeed, we have held that this Court 'will not interfere with [an] award *absent a showing that the board acted corruptly or in bad faith, or so unreasonably or arbitrarily as to be guilty of a palpable abuse of discretion.' Paul Goldman, Inc. v. Burns*, 109 R.I. 236, 239, 283 A.2d 673, 676 (1971) (citing *Gilbane*, 107 R.I. at 300, 267 A.2d at 399). Thus, although § 45-55-5 does not apply to competitive bidding processes involving concession contracts, which are contracts that produce revenue and not purchases, we conclude that, even in the absence of an applicable statute, the *Gilbane* standard must still apply." *Id.* at 255 (emphasis added); *see also H.V. Collins Co. v. Tarro*, 696 A.2d 298, 302 (R.I. 1997).

Accordingly, it is the just-quoted *Gilbane* standard—requiring a showing that the state acted "corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion"—and *Gilbane*'s progeny, including *Kayak Centre*, to which we must refer in conducting our review. *Gilbane*, 107 R.I. at 300, 267 A.2d at 399.

"On numerous occasions this Court has said that the hurdle to be overcome in overturning a decision made by the awarding authority in the public bid process is *very high*[.]" *Blue Cross & Blue Shield of Rhode Island v. Najarian*, 865 A.2d 1074, 1081 (R.I. 2005) (emphasis added). In further discussing the significant deference given to an awarding authority, we have gone so far as to hold that "[t]he decision of any official, board, agent, or other person appointed by the state concerning any controversy arising under or in connection with the solicitation or award of a contract shall be entitled to a *presumption of correctness*." *Id.* (emphasis in original) (quoting G.L. 1956 § 37-2-51); *see also HK & S Construction Holding Corp. v. Dible*, 111 A.3d 407, 412 (R.I. 2015). As such, this Court is "required both to give deference to the trial justice's findings and to give the awarding authority's determination a presumption of correctness." *Blue Cross & Blue Shield of Rhode Island*, 865 A.2d at 1081.

- 18 -

Importantly, in *Kayak Centre*, we expressly reiterated that the "bar for a potential challenger [of the award of a concessions contract] is extremely high." *Kayak Centre*, 116 A.3d at 255 n.6. We went on to expressly state that "[c]orruption, bad faith, and a palpable abuse of discretion are difficult to prove, particularly in the light of our antipathy for government by injunction." *Id.* at 255-56 n.6 (internal quotation marks omitted); *see also Blue Cross & Blue Shield of Rhode Island*, 865 A.2d at 1084 ("To rise to a showing of palpable abuse of discretion, * * * one must establish that not only were there violations of the law but also that those violations were significant."). We have even gone so far as to "admonish all justices of the Superior Court to exercise great care before issuing an injunction vacating an award of either a state or a municipal contract." *Truk Away of Rhode Island Inc. v. Macera Brothers of Cranston, Inc.*, 643 A.2d 811, 816 (R.I. 1994).

It is certainly a truism based on experience that "[a]ny good lawyer can pick lint off any Government procurement[.]" *Blue Cross & Blue Shield of Rhode Island*, 865 A.2d at 1084 (internal quotation marks omitted). However, our precedent in this area makes clear that in this case La Gondola needed to do much more than engage in such lint-picking; it was required to prove that the award of the Carousel Village concessions contract to the Zoo was the result of corruption, bad faith, or a palpable abuse of discretion. *See Gilbane*, 107 R.I. at 300, 267 A.2d at 399. Given the high level of deference which we give to a trial justice's factual findings and which our jurisprudence instructs should be given to municipal officials and boards in awarding contracts, we are simply unable to reach the conclusion that the trial justice erred in his determination that there was no corruption, bad faith, or abuse of discretion in the bidding process at issue. *See State v. Diaz*, 159 A.3d 1053, 1062 (R.I. 2017) (stating that "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts

and to judge the credibility of the witnesses") (internal quotation marks omitted); *see also National Labor Relations Board v. Erie Brush and Manufacturing Corp.*, 406 F.3d 795, 802 (7th Cir. 2005) ("The hearing officer was a front row observer for this testimony, giving her a far greater edge in making credibility determinations than we could ever hope to have in reviewing the black and white transcript.").

We acknowledge at the outset that the email communications on which La Gondola so heavily relies do indicate that Dr. Goodman believed that there was some sort of verbal commitment between the City and the Zoo to aid the Zoo in finding alternative sources of revenue; he also testified that the Zoo wanted the potential revenue-generating opportunities in Roger Williams Park "in exchange for" the City's cut in funding to the Zoo. We further acknowledge that Mr. McMahon was an "ex-officio" member of the Zoo's board during the entire period at issue. However, we cannot conclude that these facts alone indicate that the trial justice abused his discretion in his findings of fact or erred in applying the law to those facts. Indeed, the email communications reflect only that Dr. Goodman believed that there had been some sort of verbal commitment with respect to revenue sources in Roger Williams Park, not that any City official had in actuality given the Zoo any guarantees with respect to the Carousel Village concessions contract.[7] Mr. McMahon testified that he told Dr. Goodman on multiple occasions that the Carousel Village concessions were under contract, and Dr. Goodman testified that he continued to propose including the Carousel Village concessions in the new contract

---

[7] We note that Dr. Goodman testified on cross-examination that his understanding of the verbal "commitment" made by the City to the Zoo was to "explore the opportunities to provide [the Zoo] with other sources of revenue * * *." In addition, Mr. Sepe stated on cross-examination that the "verbal commitment" as to the funding reduction between the Zoo and the City, referenced in an email from Dr. Goodman to Mr. McMahon, involved the City helping the Zoo find sources of additional revenue, but he added that it was not possible for the City to "just give" the contract for the Carousel Village concessions to the Zoo.

between the Zoo and the City because it was something the Zoo "desired to have, so we kept on insisting." Dr. Goodman further testified, as did Mr. Sepe, that no one from the City promised the Zoo the Carousel Village concessions contract prior to its eventual award. We simply have no basis to assign any error to the trial justice's conclusions in this case when there is clearly ample testimony on which he could have relied to come to the conclusion that there was no corruption, bad faith, or abuse of discretion in this case.

What is more, the evidence at trial showed that the Zoo's bid was financially the superior bid by $65,431; and Mr. McMahon testified that that was the reason he recommended awarding the contract to the Zoo. La Gondola makes much of the fact that the Zoo's bid did not contain the composting toilet system. However, the Zoo's bid still contained the entire $241,000 allotted for capital improvements. Additionally, Mr. McMahon testified that the toilet "was a relatively minor item," and Mr. Sepe testified that the financial aspect of the Zoo's bid was "whole" despite the fact that it did not include the composting toilet system. We also note that the RFP itself contained specific and significant language reserving to the City the right to "accept other than the highest value proposals * * * and to waive any of the requirements of the bid selection procedures" and stating that "[t]he Parks Department reserves the right to accept or reject any or all proposals received as a result of this request, or to cancel in part or in its entirety this proposal if it is in the Parks Department best interest to do so." Mr. McMahon testified to his understanding that the RFP so stated, and the trial justice also noted that fact in his decision. Mr. McMahon also added in his testimony at trial that, generally, bidders could still "get the bid" even "if they didn't completely match every specification or requirement" due to the fact that "some of the RFPs were discretionary in nature[.]"

It is also of import that the evidence adduced at trial reflects the fact that the five-year contract extension option between La Gondola and the City would go into effect only if both parties could agree on the rent amount. Mr. McMahon testified that he nonetheless asked the Days for a rent proposal, but they opted not to provide one for approximately five months. Additionally, the trial justice expressly relied on the fact that there was no assurance that such an agreement would ever have been reached; and we likewise take due note of that consideration.

We have stated our "belief that courts can and will recognize corruption, bad faith, or a manifest abuse of discretion when it appears from the evidence presented in a case." *Gilbane*, 107 R.I. at 302, 267 A.2d at 400. The trial justice in this case did not recognize any such corruption, bad faith, or abuse of discretion. It is clear to this Court that the seasoned trial justice had sufficient evidence on which to rely in making both his findings of fact and credibility determinations and in arriving at his legal conclusions. We can find no abuse of discretion or an error of law on the part of the trial justice.

The law should not place public officials and boards in a "legalistic straitjacket" when awarding contracts. *Id.*; *see also HK & S Construction Holding Corp.*, 111 A.3d at 412. Doing so would not be in line with our jurisprudence, especially the presumption of correctness that we apply in this area. *See Blue Cross & Blue Shield of Rhode Island*, 865 A.2d at 1081. As we have previously stated, our review in this case is governed by the principle that it is our role to accord a very high level of deference—both the deference we owe the trial justice's factual findings and the presumption of correctness that we owe to the public officials involved in this contractual award—which level of deference we do not believe La Gondola has overcome in this case. *See id.*

Accordingly, after careful consideration of all the evidence adduced at trial and the contentions of the parties on appeal, it is our judgment that the trial justice did not abuse his discretion with respect to any of his factual findings and did not err in his conclusion that there was no corruption, bad faith, or palpable abuse of discretion in this case.

**B**

**The Trackless Train Amendment**

The evidence adduced at trial reflects the fact that La Gondola operated a trackless train at Carousel Village prior to the RFP and the bidding process at issue in this case. However, in the Zoo's bid, it proposed to "operate a miniature trackless train" in Carousel Village. La Gondola maintained that it possessed the exclusive right to operate a trackless train within Roger Williams Park pursuant to the Train Amendment.[8] Nevertheless, the trial justice ruled that the Train Amendment was not binding on the City and was "without force or effect."

La Gondola contends on appeal that its "exclusive right to operate the trackless train should not have ended when [Mr.] McMahon gave the Carousel Village to [the Zoo]." It avers that Mr. McMahon had the authority to enter into the Train Amendment and that the amendment did not lack consideration. It also deals with the fact that La Gondola did not sign the Train Amendment by contending that the fact that La Gondola initiated the amendment and supplied the language thereof constituted sufficient execution; La Gondola argues that "[t]he missing signature line was a mere oversight by both executing parties, La Gondola has always been willing to sign."

---

[8] The language of the Train Amendment stated that La Gondola would "remain exclusive provider of all train rides within Roger Williams Park and Zoo under this or any other current contract with the City of Providence within Roger Williams Park and Zoo."

In our judgment, the Train Amendment was invalid due to the fact that a representative of La Gondola did not sign it. The trial justice made a specific finding of fact to the effect that Mr. McMahon was the only signatory of the Train Amendment, and he held that the Carousel Village concessions contract between La Gondola and the City required both parties to sign. After reviewing the contract language at issue, we are in agreement with the trial justice.

We note initially that whether or not a contract is clear and unambiguous is a question of law. *Beacon Mutual Insurance Co. v. Spino Brothers, Inc.*, 11 A.3d 645, 648 (R.I. 2011). "Accordingly, we review a trial justice's interpretation of a contract *de novo*." *Id.* at 649.

The Carousel Village concessions contract between La Gondola and the City expressly provided as follows with respect to amendments:

> "La Gondola, Inc. and the City may amend, modify, and supplement or waive any provisions of this Agreement in such a manner as may be agreed upon by the Parties in a written instrument *executed by both Parties*." (Emphasis added.)

It is apparent to this Court from the just-quoted language of the Carousel Village concessions contract between La Gondola and the City that, for an amendment to be valid, it must be *executed* by both parties. Thus, the interpretation of this contract hinges on the meaning of the term "execute."

In our opinion, the language of the Carousel Village concessions contract between the City and La Gondola, including the meaning of the term "execute," is utterly clear and unambiguous. As such, we need not construe that unambiguous language but simply "consider the dictates of the plain language in the contract." *Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island*, 18 A.3d 495, 498 (R.I. 2011); *see also Gorman v. Gorman*, 883 A.2d 732, 739 n.11 (R.I. 2005) ("Under established contract law principles, when there is an unambiguous contract and no proof of duress or the like, the terms of the contract are

to be applied as written."). Indeed, "[w]hen the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement." *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 560 (R.I. 2009) (internal quotation marks omitted).

In the context of this case, the term "execute" in a contractual document such as the one at issue clearly refers to putting a legal document into effect *by signature*, just as a person does when he or she executes a deed or a will.[9] La Gondola relies on the fact that it drafted the language of the Train Amendment as the basis for its contention that it did in fact execute that amendment. However, it is clear to this Court that that simply does not constitute an actual execution of the amendment as required by the language of the contract between the City and La Gondola. What La Gondola terms "a mere oversight" is in fact an omission that is dispositive of the whole "trackless train" issue. The Train Amendment contains only the signature of Mr. McMahon. As such, the City certainly executed the amendment. But the contract between the parties clearly and unambiguously requires that the written instrument have been "executed by both Parties." Without a signature of an authorized person acting on behalf of La Gondola, the Train Amendment was executed by only one party. Thus, it is without force and effect.

For these reasons, we are unable to perceive any error on the part of the trial justice in concluding that the Train Amendment was not binding.

Given our conclusion that the Train Amendment was not properly "executed" in accordance with the Carousel Village concessions contract between La Gondola and the City, we

---

[9]     Although we need not look to any source beyond the plain language of the contract in this case, it is worth noting that "execute" is defined as "[t]o make valid, as by signing[.]" The American Heritage Dictionary of the English Language 620 (5th ed. 2011); *see also* Black's Law Dictionary 689 (10th ed. 2009) (defining execute as "[t]o make (a legal document) valid by signing").

need not address the issue of Mr. McMahon's authority to enter into such an amendment or whether or not there was proper consideration for the Train Amendment. *See Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n.4 (R.I. 2009) (referencing "our usual policy of not opining with respect to issues about which we need not opine"); *see also Summit Insurance Co. v. Stricklett*, 199 A.3d 523, 533 (R.I. 2019).

## C

## The Contractual Interference Claim

On appeal, La Gondola contends that it established at trial all of the elements of contractual interference. It avers that the Zoo was aware that La Gondola had a contract for the Carousel Village concessions which extended to 2020 and nonetheless encouraged the City to look for a "loophole" whereby the City would cease to be so bound.

We note initially that La Gondola's complaint included a count for intentional interference with prospective contractual relations. Despite that fact, La Gondola set forth the elements of tortious interference with contractual relations in its brief to this Court and tailored its argument to that standard. However, although the elements are nearly identical, intentional interference with prospective contractual relations and tortious interference with contractual relations are separate and distinct causes of action. *See Fogarty v. Palumbo*, 163 A.3d 526, 538, 539-40 (R.I. 2017). That being said, given how close the elements of the two causes of action are, we shall proceed to consider the trial justice's decision and La Gondola's arguments on appeal under the standard for a claim of intentional interference with prospective contractual relations; it is that cause of action which was alleged in the complaint and which was litigated before the Superior Court.

To prevail on a claim for intentional interference with prospective contractual relations, a party must establish the following:

> "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *Id.* at 540 (internal quotation marks omitted); *see also Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007).

What is more, we have stated that "the elements of the tort require showing an intentional *and improper* act of interference, not merely an intentional act of interference."[10] *Avilla*, 935 A.2d at 98 (emphasis added) (internal quotation marks omitted); *see also Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.*, 447 A.2d 377, 379-80 (R.I. 1982). "Malice, in the sense of spite or ill will, is not required; rather legal malice—an intent to do harm without justification—will suffice." *Mesolella v. City of Providence*, 508 A.2d 661, 669-70 (R.I. 1986). We have also stated that "[t]he burden is on the defendant to show justification." *Id.* at 670.

We are unable to perceive any error on the part of the trial justice in entering judgment in favor of the Zoo on this count in La Gondola's complaint. La Gondola's contract with the City for the Carousel Village concessions expired on April 30, 2015. The Zoo's contract with the City with respect to the Carousel Village concessions was not intended to commence until after

---

[10] We also have recognized a non-exhaustive list of factors to be considered in assessing whether there was an improper interference as follows:

> "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." *Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007) (internal quotation marks omitted).

April 30, 2015, when La Gondola's contract with the City would have already expired. It should further be borne in mind that the Train Amendment has now been held to be invalid. Thus, there was no contract beyond April 30, 2015 for the Zoo to have interfered with. And, in our opinion, any prospective contractual relations or ongoing business relationship between the City and La Gondola with respect to Carousel Village after that date was too speculative and uncertain to be considered an expectancy. *See Fogarty*, 163 A.3d at 540.

We readily acknowledge that there was a *potential* five-year extension to the Carousel Village concessions contract between La Gondola and the City with rent payments "mutually agreed upon by both parties prior to April 30, 2015." As the above-quoted language of the contract makes clear, any expectancy of a prospective contractual relationship between La Gondola and the City with respect to Carousel Village beyond April 30, 2015 required a mutual agreement on the rent to be paid. Despite that fact, La Gondola failed to make a rent proposal to the City for approximately five months after it was requested and did so only after the bids had been opened. Instead, La Gondola wanted the City to consider entering into a longer-term extension in exchange for La Gondola performing some capital improvements to Carousel Village. As the trial justice noted, in the end it is not at all certain that the City and La Gondola would ever have agreed upon an appropriate rent for a five-year extension.

What is more, it is clear to this Court that there was ample evidence adduced at trial to support a conclusion that, although the Zoo may have acted intentionally, it did not behave improperly. *See Avilla*, 935 A.2d at 98. Certainly the Zoo was aggressive in pursuing its goals with respect to its new contract with the City. (We note that Mr. McMahon and the City did not assent to the Zoo's requests.) However, the Zoo certainly did not act with any legal malice or employ any illegal means under the facts of this case; the City had the right to put the contract

out to bid and to select the highest bidder to be awarded the contract. *See id.* at 99 (expressing approval for the requirement that, in an intentional interference with prospective contractual relations case, "a searching analysis only of motive is in most instances [not] enough to send these cases to the jury[;] [t]here must still * * * be something 'illegal' about the means employed") (internal quotation marks omitted); *Mesolella*, 508 A.2d at 669-70; *see also Roy v. Woonsocket Institution for Savings*, 525 A.2d 915, 919 (R.I. 1987) (finding, in an intentional interference with prospective contractual relations case, no evidence indicating "legal malice"). As such, we are unable to perceive a basis for concluding that the Zoo intended to do harm to La Gondola without justification. *See Mesolella*, 508 A.2d at 669-70.

Thus, without evidence of the existence of improper interference on the part of the Zoo, La Gondola's claim for intentional interference with prospective contractual relations could not succeed. Accordingly, it is our considered opinion that the trial justice did not err in entering judgment in favor of the Zoo on La Gondola's claim of intentional interference with prospective contractual relations.

## IV

### Conclusion

In conclusion, the trial justice did not abuse his discretion or commit a clear error of law when he concluded that there was no corruption, bad faith, or a palpable abuse of discretion in this case. He further did not err in finding the Train Amendment to be not binding. Nor does this Court perceive any error in his conclusion that La Gondola was not entitled to relief on its claim of intentional interference with prospective contractual relations.

For the reasons set forth herein, we affirm the judgment of the Superior Court. We remand the record to that tribunal.

**Justice Goldberg, dissenting.** In its papers in this case, La Gondola, Inc. correctly sets forth the controlling criteria that must be established to successfully challenge a municipality's bid-procurement process as that of corruption, bad faith, or conduct so arbitrary and unreasonable as to amount to a palpable abuse of discretion. La Gondola then posits:

> "Can that test ever be met?
> "If not here, then maybe not ever."

In the face of the record proof before the Court, I am compelled to agree; I therefore dissent.

The evidence in this case overwhelmingly established that the City of Providence and the Zoological Society embarked upon a concerted effort to take the Carousel Village concession from La Gondola in order for the City to avoid paying $300,000 to the Zoological Society. This is a *quid pro quo*. The Zoo promised the City that the only way the City could be relieved from paying the $300,000 it was contractually obliged to pay was to transfer the concession contracts in the Park to the Zoo. The City's motive to set aside the La Gondola contract and the conflicts and lack of good faith by the Park Superintendent infected the entire bid process and resulted in bad-faith conduct that is so unreasonable and arbitrary as to amount to a palpable abuse of discretion. Although the law recognizes that public officials are permitted to exercise discretion in awarding bid contracts, that does not, in my opinion, overcome these wrongs; nor should this Court excuse them.

The evidence presented at trial, including numerous damning emails, clearly established that the plan to deliver the Carousel Village concession to the Zoo was conceived a full year before the original contract term with La Gondola was due to expire. The City would be relieved from paying $300,000 that it was contractually obliged to pay to the Zoo if, and only if, the City could deliver the concession contracts to the Zoo.

The Zoological Society's newly appointed director, Dr. Jeremy Goodman, who, from his prior employment, was versed in the potential revenue the Carousel Village could generate, testified that he wanted to erect an aerial rope course in the park in order to increase the Zoo's revenues; access to the Carousel Village was a crucial component of his plan to construct it. Goodman admitted that he was interested in taking over the concessions operated by La Gondola, including the Carousel Village, the trackless train, and the rental boats. Goodman testified that the Zoo "was interested in all the revenue generating opportunities in the park[.]" Goodman succeeded. At the end of the two-and-one-half-year term that La Gondola had assumed from the prior concessionaire, and without the benefit of the five-year extension that was granted by the City, La Gondola was forced to vacate. The evidence also established that, during its brief tenure, La Gondola, at its own expense, made significant labor investments and capital expenditures in reliance on its contract with the City.

At a meeting in 2014, Goodman testified, the Zoo and the Parks Department began discussions about the City getting out of its contract with La Gondola. The superintendent, Robert McMahon, was directed by Alan Sepe, the director of operations for the City, to look into getting out of the La Gondola contracts in favor of the Zoo. Despite the fact that La Gondola had a five-year extension and the exclusive right to operate the train in the park, La Gondola lost its concession contract and the right to operate the train anywhere in the park. By awarding the contract to the Zoo, the City avoided paying the $300,000 that it owed the Zoo. This was the *quid pro quo*.

The events of this case, as set forth in the email communications between the defendants, shock the conscience of this justice.

La Gondola assumed the Carousel Village concession contract in November 2012; its tenure was brief. Goodman arrived on the scene in July 2013. Because of his unrelenting efforts on behalf of the Zoo, La Gondola lost its contract, despite an option to renew the contract for an additional five years. This option expressly provided that "[a]nnual rent for May 1, 2015 thru April 30, 2020 *will be* mutually agreed upon by both parties prior to April 30, 2015." (Emphasis added.) At the very least, the parties were contractually bound to attempt to reach an agreed-upon rent. Parties to a contract owe a duty of good faith and fair dealing. Because of the City's agreement with the Zoo, that did not occur. The trial justice misconceived this evidence.

Allen and Cynthia Days, the principals of La Gondola, testified to the significant investment of time, labor, and material in Carousel Village which, it was undisputed, had been long-neglected by the City and the previous concessionaire. The entire carousel building was cleaned from top to bottom, including powerwashing the floors, installing carpeting in the former gift shop, and replacing the lightbulbs on the carousel itself with LED lights,[11] which would save the City $43,000 a year in electricity costs. They also cleaned the carousel from the top of the canopy, including polishing the poles, to the floor. The restrooms required extensive cleaning and maintenance. The Days installed an air-conditioning system in the carousel building for humidity control. La Gondola also purchased a trackless train for $58,000, as anticipated by the City in the original contract. Because the trackless train addition was included in the original contract between the parties, no additional rent was required. La Gondola then undertook the renovation of an existing tunnel to enhance the train ride experience. La Gondola cleared about fifty truckloads of refuse from the abandoned train tunnel, and powerwashed the space, at a cost of approximately $20,000.

---

[11] La Gondola received a $6,000 rent abatement from the City for the cost of the bulbs, but not labor.

While the Zoo's plan to deprive La Gondola of its concession contracts was proceeding, there was no discussion about La Gondola's annual rent increase that was scheduled to commence on May 1, 2015. Allen Days testified that, in January 2014, he and Cynthia met with McMahon at the carousel building and made a presentation about what they wanted to do to improve the operation and the repairs that needed to be done. He provided McMahon with a list of what he considered to be necessary. Allen Days testified that he knew "that the city didn't have any funds to make the repairs," and he offered to fund the repairs from their own resources if the City would be willing to extend the lease another five years. He testified that McMahon was receptive because it was a way for the City to have the repairs accomplished. However, the Days also knew that they had a five-year option in place as a fallback if the request was not granted. McMahon, knowing this would require approval from the Board of Contract and Supply, did nothing. Ten months elapsed. In November 2014, the parties sat down to discuss the rent increase. This meeting was a sham. La Gondola's fate had already been sealed; the Zoo had an agreement to take over the Carousel Village contract before the Days were even notified that the option would not be honored.

At that November 2014 meeting between the Days and McMahon, the Days were informed that there would be an RFP for the Carousel Village, notwithstanding the renewal option in the contract. There was no negotiation for an agreed-upon rent, as required by La Gondola's contract. Allen Days testified that McMahon assured him that "he honestly didn't think anyone would be interested in bidding on the carousel." This statement is belied by the evidence in this case consisting of the email correspondence between the municipal defendants and the Zoological Society. McMahon's role in this case, standing alone, is grounds to set the bid procedure aside.

The record establishes that McMahon was an ex-officio member of the Board of Trustees of the Zoological Society. The fact that he was not a voting member of the Board is of no moment in this case. After McMahon prepared the RFP, he attended a Board meeting during which the RFP was discussed. The Zoo expressed its concerns about the length of the contract in light of the capital improvements. Two days after the Board meeting, McMahon issued Addendum 2 to the RFP and promptly sent an email to Goodman *before* the Addendum was published. That email reads as follows:

> "AFTER LISTENING TO YOUR PRESENTATION WEDNESDAY NIGHT ON THE CAROUSEL BID YOU ARE PREPARING, I HAVE ISSUED AN ADDENDUM TO BASICALLY EASE THE FINANCIAL BURDEN OF THE REQUIRED CAPITAL IMPROVEMENTS * * * PURCHASING WILL NOTIFY YOU TODAY ABOUT THIS TODAY, BUT I AM SENDING IT TO YOU DIRECTLY NOW SINCE TIME IS OF THE ESSENCE.
>
> "IF YOU HAVE ANY QUESTIONS TODAY OR OVER THE WEEKEND, PLEASE CALL ME ON MY CELL * * * [PHONE NUMBER]."

In the face of this evidence, I am hard-pressed to see how the trial justice could conclude that there was no bad faith or corruption "in any testimony or exhibit admitted during the trial." If securing a $300,000 *quid pro quo* with an RFP issued by a member of the Board of Trustees, who then recommends that the contract be awarded to the Zoo, is not bad faith and a palpable abuse of discretion, then what is?

Additionally, the very chronology of events, as set forth in the email evidence, establishes that the decision to award the concession contract to the Zoo was made before the Days were even asked to submit a proposal for the renewal option, and shows that the Parks Department violated its duty of good faith and fair dealing. As early as April 2014, more than a year before

the original contact term was due to expire, Goodman asked McMahon for copies of La Gondola's current contracts for the carousel and all food, the frozen-lemonade truck and paddleboats because "[w]e'd like to review them and put the wording for any requirements in the proposed new contract." McMahon complied.

On May 27, 2014, just short of a year before the contract expired and six months before the Days were informed that its option was not going to be honored, Goodman emailed McMahon and outlined the savings the City could realize by "allowing the zoo to assume operations of the carousel park, park's food concessions and paddleboats." He included a proposed schedule of reduced payments to the Zoo in exchange for the City giving the Zoo the "Carousel, park food and paddleboats." Significantly, the City began implementing this reduced payment schedule *before the RFP was issued*. As will be discussed, this is part performance by the City.

On August 22, 2014, Goodman again corresponded with McMahon to confirm the terms of an oral agreement, which had been reached in July, that the Zoo would take over the carousel and food operations and the City would decrease its payments by $300,000. Goodman wrote: "This was the verbal commitment made by each party when we first met." However, on August 26, 2014, McMahon advised Goodman about the option to extend La Gondola's contract with the City.

On October 8, 2014, Goodman notified McMahon that the Carousel Village concession contract was crucial to the Zoo's plan to erect an aerial obstacle course and that, without the concession "*that was verbally committed to by the City*, the Society will not be able to honor its verbal commitment to modify the existing written contract." (Emphasis added.) Two days later, at 9:23 a.m., McMahon responded and assured Goodman that the City was "committed to

providing the Zoo with the opportunity to gain additional revenue in the park" and, because the option required the parties "to agree on new terms * * * we do have a loop hole [*sic*] to go out to bid on a new Carousel operator for a new lease starting in May 2015." That same day, October 10, 2014, at 11:01 a.m., the Days received the following email from Karen Gomez of the Parks Department:

> "Bob [McMahon] and I were just discussing all the park leases. I have attached a copy of the last [award which] has a 5 year option that can be exercised with new mutually agreed to terms. * * * Please let us know what you are considering and if applicable, what type of lease income you are will[ing to] offer the parks department for the next five years if you plan to ask to exercise the 5-yr option."

To be sure, the same morning that McMahon notified Goodman about the loophole and reaffirmed the City's commitment to deliver the zoo concession in an email on which Gomez was copied, Gomez sent an email to the Days. There were six months left on their contract. The Days had made a proposal to McMahon in January 2014. A meeting was scheduled between McMahon and the Days. They were informed that the five-year option would not be honored and that there would be an RFP. Allen Days testified that they were concerned because "we had five years already in place. But [McMahon] had told us that he honestly didn't think anyone would be interested in bidding on the carousel."

The trial justice misconceived this evidence and characterized Gomez's October 10, 2014 email to La Gondola as "the City's request seeking an early agreement with respect to the request for a 'rental' proposal for the ensuing five year extension." However, this email was sent to the Days the same morning that McMahon advised Goodman that he found a loophole in the La Gondola contract. The email to the Days was a sham and clear evidence of bad faith. The trial justice overlooked this evidence. When the parties met in November, there was no effort to

reach an agreement on rent; indeed, it was not discussed. The Days were informed that there would be an RFP. Also, the trial justice overlooked the evidence that McMahon and the Days had an extensive meeting at the carousel building in January 2014 to discuss capital improvements and a potential contract extension.

Searching for a loophole to avoid a contractual commitment to La Gondola, and then assuring Goodman of the City's commitment to the Zoo for the concessions at the park, is not good faith and fair dealing. Then, an email to the Days the same morning asking them what they were willing to offer for an option the City had no intention to honor is not the good faith and fair dealing that our law requires of the parties to a contract. "Virtually every contract contains an implied covenant of good faith and fair dealing between the parties." *Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I. 2002) (brackets omitted) (quoting *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996)). Because this implied covenant of good faith and fair dealing is designed to ensure "that contractual objectives may be achieved," neither party to the agreement "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *McNulty v. Chip*, 116 A.3d 173, 185 (R.I. 2015) (internal citations omitted).

At trial, Goodman and the City denied that there was an agreement between the Zoo and the City. Yet, the evidence proved that the City undertook part performance of this agreement when, in October 2014, it made reduced payments to the Zoo that exactly matched the contract modification that was discussed by the parties. Tellingly, in an email dated October 23, 2014, after the reduced payment, Goodman warned the City that, unless it delivered on its verbal commitment to provide the Zoo with the Carousel Village concession, the Zoo did not waive its right to the full amount owed under the contract. Goodman didn't stop there. In a second email

that same day, he informed McMahon that he had just spoken with Alan Sepe "and everything is good[.]" Thus, after Goodman spoke with Sepe, "everything [was] good[.]" At this point, the Days had not yet been notified that the City would not honor the option in its contract. But the Zoo accepted the reduced payment and the City delivered the concession.

The trial justice misconceived this evidence and was clearly wrong. He found that "there is no evidence of either an affirmation or denial by City officials of any such commitment in written communications between the City and the Zoo." However, a writing is not necessary. The circumstantial proof of this commitment is clear, and the trial justice failed to address it. An inference can be drawn from the conduct of the parties and their communications in this case. Furthermore, as La Gondola raised before this Court, under Rule 801 of the Rhode Island Rules of Evidence, the City's silence in the face of Goodman's repeated declarations about verbal commitments made by the parties, including his statement that after speaking with Alan Sepe, "everything is good[,]" constitutes an adoptive admission by defendants. This adoptive admission, coupled with the fact that the City undertook part performance of the agreement by utilizing the payment schedule proposed by Goodman in May 2014, is highly relevant—indeed conclusive—evidence of an agreement and a *quid pro quo*.

There was testimony at trial devoted to the unavoidable fact that the Zoo's bid was nonresponsive. The capital improvement relative to the installation of the Clivus Multrum System waterless toilet system was not included in the Zoo's bid. Rather than comply with this bid requirement, the Zoo declared that the installation of this system was not necessary for the operation of the concessions, because there were existing restrooms in the building. However, McMahon testified that there were problems with those restrooms because they were serviced by a pump station rather than a gravity-fed system. This was why he included the composting toilet

in the RFP. Allen Days testified that the City was forced to rent portable toilets every year because the restrooms did not function; La Gondola submitted a responsive bid. McMahon, a member of the Zoo's Board of Trustees, decided to overlook the Zoo's failure to conform to the bid requirements. Had McMahon rejected the bid as nonresponsive, the City would not have been able to deliver on its half of the *quid pro quo*.

The trial justice and a majority of the members of this Court have overlooked and misconceived the undisputed facts produced at trial and have avoided applying those facts to the law of public bidding contracts as developed by the Court. Indeed, the majority characterized the overwhelming evidence produced by La Gondola as "lint-picking." The majority concludes that there was "ample testimony on which [the trial justice] could have relied to come to the conclusion that there was no corruption, bad faith, or abuse of discretion in this case." Yet, the majority fails to point to any such evidence. Rather, the majority, like the trial justice, is myopically focused on the bids that were submitted and wholly overlooks the collusive behavior that began during the original term of La Gondola's contract, well before the RFP was issued. This conduct so infected the process as to constitute a palpable abuse of discretion as a matter of law. The majority opinion repeatedly recites its obligation to accord deference to the trial justice's factual findings. However, our responsibility does not end there. It is our duty to determine whether the trial justice has overlooked or misconceived the evidence or was otherwise clearly wrong.

This Court's oft expressed, but rarely applied, principle—namely, that a bid procedure which is tainted with bad faith and a palpable abuse of discretion will be set aside—should have meaning. The fact that public officials are vested with discretion in bid procurements does not mean that what occurred *before* the bids were received is irrelevant or immune from scrutiny,

particularly when the municipality has an undisclosed monetary stake in awarding the bid to a favored bidder. It is my opinion that the conduct of the defendants and the clandestine agreement between the City and the Zoo *before* the bids were opened, including the fact that McMahon sat on the Zoo's Board, attended a board meeting in which the RFP was discussed, issued an addendum to accommodate the Zoo, and then accepted the Zoo's nonresponsive bid in the face of a responsive bid by La Gondola, was so egregious that the bid procedure should be declared invalid.

Additionally, it is my opinion that the Zoo intentionally and tortiously interfered with La Gondola's contractual relations. The trial justice made no findings of fact respecting this claim whatsoever; he simply awarded judgment for the Zoo. This is reversible error. The majority ignores this error and proceeds to make its own findings of fact and concludes that there was no evidence of improper interference on the part of the Zoo. Why would this Court engage in its own fact-finding in the context of a jury-waived trial?

A prima facie case of tortious interference with contractual relations is established by a showing of "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his or her intentional interference; and (4) damages resulting therefrom." *Belliveau Building Corporation v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000) (brackets omitted) (quoting *Smith Development Corporation v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). These factors were established at trial. There was no dispute that La Gondola and the City of Providence had a contract for the Carousel Village concession. Nor can it be disputed that the Zoo knew about La Gondola's contract with the City, as evidenced by the emails introduced at trial and the numerous communications between the Zoo and McMahon about getting the La Gondola contract for the Carousel Village. Goodman asked for and received

copies of all of La Gondola's contracts with the City in order to prepare for the Zoo's new contract. McMahon obliged. The Zoo's efforts to wrest this concession from La Gondola continued right up to the point that McMahon found a loophole in La Gondola's contract in order to deprive La Gondola of the benefit of the five-year renewal option.

The evidence that Goodman knowingly and intentionally interfered with La Gondola's contractual rights in this case and muscled the City and McMahon (who abruptly departed a month later) into abandoning the City's obligation of good faith and fair dealing is manifest. The trial justice found that "[i]n its discussions and communications with the Park superintendent, the Zoo pressed for the handing over to it of the Carousel Village Concession[.]" The Zoo succeeded. Finally, damages also were proved at trial. I am hard-pressed to envision any stronger proof of tortious interference.

In conclusion, Allen and Cynthia Days are hard-working owners of a small business with five children. They assumed a contract to operate the Carousel Village in Roger Williams Park. The contract specifically recited that it was the City's desire "to obtain management services to operate Carousel Village for the remainder of the original term ending April 30, 2015 plus an additional 5 year term granted by the Board that will end April 30, 2020[.]" The parties agreed that "Annual Rent for May 1, 2015 thru April 30, 2020 will be mutually agreed upon by both parties prior to April 30, 2015." After a significant investment of capital and labor, the Days were deprived of the benefit of their bargain in a most unfortunate way. This is an unjust result. I dissent.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | La Gondola, Inc. v. City of Providence, by and through its Treasurer James J. Lombardi, et al. |
| **Case Number** | No. 2016-282-Appeal. (PC 15-1779) |
| **Date Opinion Filed** | June 17, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Michael A. Silverstein |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Thomas M. Dickinson, Esq. |
| | For Defendant: <br><br> Jillian H. Barker, Esq. <br> Harris K. Weiner, Esq. |

SU-CMS-02A (revised June 2016)